Argued April 6, reversed May 25, 1960

# DILGER v. SCHOOL DISTRICT 24CJ

352 P. 2d 564

*Pat Dooley,* Portland, argued the cause and filed briefs for appellant.

*Robert De Armond,* Salem, argued the cause and filed a brief for respondent.

Before McAllister, Chief Justice, and Rossman, Warner, Perry, Sloan, O'Connell and Goodwin, Justices.

O'CONNELL, J.

The plaintiff prays for a declaratory judgment adjudicating the respective rights and duties of the plaintiff and the defendant School District under ORS 336.260, popularly known as the released time statute. The defendant demurred to the complaint on the ground that it failed to state a cause of action. The trial judge raised a question as to whether an application for a declaratory judgment is demurrable, whereupon counsel for both parties requested the court to make a final determination of the matter upon the record as it then stood. By their stipulation the parties and the court understood that the statute was

being attacked as unconstitutional on the ground that it was vague, indefinite and uncertain. The court treated the issue so formed as the justiciable controversy presented to him for determination. From a judgment sustaining a demurrer to plaintiff's complaint, plaintiff appeals.

ORS 336.260 reads as follows:

"336.260 *Attendance at religious instruction.* Any child attending the public school, on application of his guardian or either of his parents, may be excused from such school for a period or periods not exceeding 120 minutes in any week to attend weekday schools giving instruction in religion."

The plaintiff notified the defendant in writing that he desired that his two children, then attending West Salem School, should be excused from school attendance for a period or periods not exceeding 120 minutes in any one week for the purpose of receiving religious instruction. The defendant, acting through its Superintendent of Schools, denied plaintiff's application for the requested release. The superintendent's action was later ratified by the defendant. Defendant's demurrer was interposed on the ground that the complaint failed to state facts sufficient to constitute a cause of suit.

In sustaining the demurrer the trial court held that ORS 336.260 was fatally defective in that it failed to designate the official or board in the school system to whom the application for released time is to be made, and further, that although ORS 336.990 makes the violation of ORS 336.260 a misdemeanor, there is nothing in the statutes to indicate who is punishable for a violation of ORS 336.260.

We must first decide whether the failure of ORS

336.260 or any other statute to specifically designate the school official or officials to whom the application for released time is to be made renders the statute void for indefiniteness.

 It is axiomatic that the courts cannot in the guise of construction supply an integral part of a statutory scheme omitted by the legislature. *State of Oregon v. Davis*, 207 Or 525, 296 P2d 240 (1956); *State v. Wolf*, 17 Or 119, 129, 20 P 316 (1888); ORS 174.010; Crawford, Statutory Construction, § 169. See, *City of Athena v. Jack*, 115 Or 357, 236 P 760 (1925). As stated in *State ex rel Everding v. Simon*, 20 Or 365, 373, 374, 26 P 170 (1891):

> "* * * Courts cannot supply omissions in legislation, nor afford relief because they are supposed to exist. To adopt the language of Mr. Justice Woods, in Hobbs v. McLean, 117 U.S. 579, 'when a provision is left out of a statute, either by design or mistake of the legislature, the courts have no power to supply it. To do so would be to legislate and not to construe.' 'We are bound,' said Justice Buller, in *Jones v. Smart*, 1 T.R. 44, 'to take the act of parliament as they have made it; a *casus omissus* can in no case be supplied by a court of law, for that would be to make laws; nor can I conceive that it is our province to consider whether such a law that has been passed be tyrannical or not'; and Mr. Justice Story, in *Smith v. Rines*, 2 Sumn. 354, observes: 'It is not for courts of justice *proprio marte* to provide for all defects or mischiefs of imperfect legislation.' (King v. Burrell, 12 A. & E. 460; Lamond v. Eiffe, 3 Q. B. 910; Bloxam v. Elsee, 6 B. & C. 169; Bartlett v. Morris, 9 Port. 286.)"

But a statute may be legally complete although the administrative machinery by which it is to be made operative is found elsewhere in the statutes, and the

implementing statutes may be effective to complete the statutory scheme even though it is necessary in doing so to resort to implication. And so, where a statute is silent as to the manner in which a governmental agency such as a district school board is to carry out the purpose of the statute, it is permissible in determining the nature of the agency's functions to look at the character of its function as defined in other statutes. *State v. Buck,* 200 Or 87, 262 P2d 495 (1953); *City of Wichita v. Wyman,* 158 Kan 709, 150 P2d 154 (1944); 3 Sutherland, Statutory Construction (3rd ed), § 6604. Likewise, where the statute does not specify the agency which is to administer the law it is proper for the court to regard the statute as impliedly allocating the administration of the law to the agency which was created by the legislature to carry out the same type of function with which the statute is concerned. Our statutes are replete with instances in which the legislature has set out various duties which are to be performed or powers which may be exercised in carrying out the school laws without mentioning in the statute the specific agency in the school system which is invested with such powers and duties. In the very chapter in which ORS 336.260 is compiled we find other sections which prescribe conduct without any designation of the school official who is to be responsible for administering the section. ORS 336.160; ORS 336.180.

The school district is the agency which is charged with the duty of carrying out the details involved in the administration of the public schools. The day to day tasks which are incident to the teaching of the pupils, including their daily attendance at school, are left to the school district acting through its superintendent, the various school principals and teachers.

It would be impossible for the legislature to specify in detail each of the powers and duties which might be performed by the school board or its representatives or to indicate in each instance which official, board or person in the hierarchy of school administration is to perform each function.

■ From an examination of the entire school code we think that it is clear that the legislature intended that the administration of the released time statute should devolve upon the district school board acting through its representatives. As we shall explain more fully below, the only administrative task involved in carrying out ORS 336.260 relates to the orderly functioning of the day to day operation of the school program. That is a task which must be carried out by those who are dealing directly with the problems as they arise in the course of dealing with the pupils and their parents. The administration of ORS 336.260 is of this character and the school district and its representatives are responsible for carrying out the purpose of the statute.

We turn then to a consideration of the character of the school board's powers and duties under ORS 336.260. The defendant argues that even assuming that the statute can be construed as vesting in a particular agency the authority to act, nevertheless the statute is invalid for still another reason. It is urged that ORS 336.260 vests in the administrative agency an unguided and uncontrolled discretion to determine whether a pupil will be released for religious instruction. Certainly the statute would be unconstitutional if there were no standards against which the school officials' action could be tested. 1 Davis, Administrative Law Treatise, §§ 2.07, 2.08, 2.11; Forkosch, Administrative Law, §§ 81-84. But we are

of the opinion that the statute should not be so construed.

■ First, we regard the statute as vesting in the pupil's parent or guardian and not the school officials, the power to determine whether the pupil will spend a part of his school time not exceeding 120 minutes in any week in religious instruction. Obviously the legislature did not intend that the school officials should have any voice in deciding whether a particular pupil should receive religious instruction. It seems equally obvious that it was not intended to invest in the school officials the authority to weigh the respective values of religious and nonreligious instruction and decide whether less than 120 minutes in any one week would be sufficient for a particular pupil's spiritual needs. The statute must, therefore, be construed as requiring the granting of an excuse upon an application by the parent or guardian.

■■ It does not follow that the school officials have no discretion whatsoever in the course of carrying out the mandate of the statute. The statute is silent with respect to the specific manner in which the school is to adjust its program to the demands of those who wish to have their children released from school. The statute does not say that a parent or guardian can set the time when the child shall be released. Neither does it say that the school officials shall set the time. But a statute is not invalid on the ground of indefiniteness or on the ground that it grants an unguided discretion, merely because it fails to set out the various details necessary to the administration of the statute. There are numerous examples of statutes which impose a duty upon an administrative agency but leave the manner of administering the statute to the administrative agency's discretion. Some

of the statutes relating to the function of school districts are cast in this form. ORS 330.150; ORS 330.780; ORS 332.110; ORS 332.200; ORS 336.100; ORS 336.310. School districts in this state have the direct responsibility for the operation of the schools. ORS 336.010 et seq. They may make rules and regulations for the government of the district. ORS 332.330. Scores of details of administration are worked out by the school boards, the principals and the teachers. The statute in question simply adds another of these chores to this list of administrative duties. We are entitled to assume that the legislature, in charging the school officials with the duty of excusing pupils for religious instruction, did not intend that that duty should be exercised without regard to the other functions of the school. The statute must, therefore, be construed to permit the exercise of a reasonable discretion by the school officials in the administration of the statute; not in granting or withholding permission to attend religious instruction, but in determining the time within the school day or school week when the pupil shall be excused. Thus, if it should be determined by the principal of the school that the released time must be made to fall during a study period rather than during an instruction period, or that it must fall upon a certain day of the week, or if any other reasonable regulation is made affecting the granting of excuses for religious instruction, the exercise of such discretion is contemplated by the statute. It would be possible, of course, for a school official to act arbitrarily or to impose unreasonable conditions in acting upon requests for released time. But in such cases the remedy of the aggrieved person is not to strike out the statute granting the discretion, but to force the official, through appropriate legal proceedings, to act reason-

ably. See, *Castel v. Klamath County*, 56 Or 188, 108 P 129 (1910).

The defendant emphasizes the fact that ORS 336.260 is cast in discretionary language, providing that a child "may be excused." Reference is also made to the title to the bill which created ORS 336.260 which states that it is a bill "To *authorize* excusing children attending public schools to attend schools giving religious instruction." It is argued that since discretion is vested in the governing body of the school the statute must either be held unconstitutional because no standards are provided to guide the exercise of the discretion or, if the statute is regarded as valid, the plaintiff has no remedy because the defendant in denying the plaintiff's request was simply acting within the authority conferred upon it by statute. Defendant's argument assumes that under the statute the school authorities are granted the power to wholly preclude a child from religious instruction during school hours.

▮ As we have already indicated, we cannot agree with this position; the excuse must be granted subject to the school's power to designate the time when the child will be released. In one sense, then, the statute is mandatory—the child must be excused upon a proper application. In another sense, the statute is discretionary in permitting the administrator of the school to adjust the time within which the child will be released.

▮ The fact that the statute states that a child "may be excused" does not preclude the construction we have adopted. If necessary to carry out the intention of the legislature it is proper to construe the word "may" as meaning "shall." *Hubner v. Hubner*, 67 Or 557, 136 P 667 (1913); *Real Estate Assn. v. Port-*

*land,* 23 Or 199, 31 P 482 (1892); *McLeod v. Scott,* 21 Or 94; 24 P 1061, 29 P 1 (1891); *Kohn & Co. v. Hinshaw,* 17 Or 308, 20 P 629 (1889); *Springfield Milling Co. v. Lane County,* 5 Or 265 (1874). See, Freund, Legislative Regulation, p 225; Crawford, Statutory Construction, § 262. There is a reasonable hypothesis for the assumption that the draftsman of ORS 336.260 used "may" to express a mandatory rather than a discretionary function of the school district in releasing pupils for religious instruction. The basic idea in the education code with respect to attendance is expressed in ORS 339.010 which states that, subject to certain exceptions, all children between the ages of 7 and 18 years are required to attend a public full-time school. The chapter then sets out certain exceptions to this basic requirement. These exceptions may be viewed as an authorization to the proper school officials to exempt attendance upon a proper showing that the exception applies, i.e., that upon such showing the officials "may" excuse attendance. ORS 336.260 is also an exemption from attendance and could well have been drafted in terms of what the school district "may" do in the particular instance, i.e., to relieve the child from the compulsory education provision found in ORS 339.010 in the event that application is made for a release of the child for religious instruction.

■ We regard the statute as stating that a child shall be excused upon the presentation of a proper application for his release. The authority of the school district or its representatives to adjust the time when the child's absence shall fall in the school day, although not expressed, is derived by implication from the other sections of the school law which delegate to the school district and its representatives the power to operate the schools and to make such regulations as are neces-

sary to do so. See, for example, ORS 332.340, ORS 336.030, ORS 339.030(7), ORS 339.010, ORS 336.010.

■ The trial court held that ORS 336.260 was unconstitutional on the further ground that a violation of the statute is made a misdemeanor under ORS 336.990 and that the person who is subject to penalty for violation of ORS 336.260 is not made certain. We shall assume, without deciding, that ORS 336.990 is invalid on the ground stated by the trial court. But this is not an action in which the penalty prescribed in ORS 336.990 is sought. If, therefore, ORS 336.990 and ORS 336.260 are severable, the invalidity of ORS 336.990 is immaterial; the invalid section may be stricken and the other section, if sustainable as an independent provision, must be sustained. This is clearly the case here. Proof of the independent character of ORS 336.260 is found in its legislative history. ORS 336.260 was first enacted in 1925 (Oregon Laws 1925, ch 24). Until 1951 no criminal penalty was imposed for the violation of the section. In 1951 the legislature enacted a catch-all penalty provision relating to the sections in the chapter on education of which ORS 336.260 (then § 111-3014, O.C.L.A.) was a part. The 1951 penalty statute simply provided that the "Violation of the provisions of title 111, O.C.L.A., for which a specific penalty is not provided is a misdemeanor."

In the general revision of the statutes in 1953 the foregoing provision was revised to read as it now does in ORS 336.990. It is apparent from the history of the two sections in question that ORS 336.260 was intended to have effect as a noncriminal statute long before the penalty section was added.

■ It is elementary that the unconstitutional part of a statute may be excised without destroying a sep-

arable part of the statute. ORS 174.040. *Seale, et al. v. McKennon,* 215 Or 562, 336 P2d 340 (1959); *Dodd v. State Industrial Accident Commission,* 211 Or 99, 310 P2d 324, 311 P2d 458, 315 P2d 138 (1957); *Fullerton v. Lamm,* 177 Or 655, 163 P2d 941, 165 P2d 63 (1946); *State v. Terwilliger,* 141 Or 372, 11 P2d 552, 16 P2d 651 (1933); *State ex rel. Pierce v. Slusher,* 119 Or 141, 248 P 358 (1926).

The principle of separability applies where the part of the statute which must be stricken is a penalty provision. This may be illustrated by reference to two cases. In *International & G. N. Ry. Co. v. Anderson County,* (Tex Civ App) 174 SW 305, aff'd, 246 US 424, 38 S Ct 370, 62 L Ed 807 (1915), a statute was attacked on the ground that it imposed excessive penalties. The court said, at pages 318, 319:

> " * * * The penalty provision of this act being severable, and no penalties being here inflicted, that portion of the act is of immaterial consideration. Railway Co. v. Michigan R. R. Com., 231 U. S. 457, 34 Sup. Ct. 153, 58 L. Ed. 319; Railway Co. v. Garrett, 231 U. S. 298, 34 Sup. Ct. 48, 58 L. Ed. 229."

A similar pronouncement is made in *Grand Trunk Ry. Co. of Canada v. Michigan Railroad Commission,* 198 F 1009 (E.D. Mich), aff'd, 231 US 457, 34 S Ct 152, 58 L Ed 310 (1912). There also the statute was assailed on the constitutional ground that it imposed an excessive penalty. In answer to the contention that the entire statute was unconstitutional the court said, at page 1021:

> " * * * It is sufficient to say that we have not before us an action for the recovery of penalties, that the penalties are embraced in a section by themselves, and thus plainly separable from the provisions here involved; and the question of the

constitutionality of the penalty clause may properly be left to be determined should an effort be made to enforce the same. Wilcox v. Consolidated Gas Co., 212 U. S. 19, 53-54, 29 Sup. Ct. 192, 53 L. Ed. 382; United States v. Delaware & Hudson Co., 213 U. S. 366, 417, 29 Sup. Ct. 527, 53 L. Ed. 836; Grenada Lumber Co. v. Mississippi, 217 U. S. 433, 443, 30 Sup. Ct. 535, 54 L. Ed. 826."

To the same effect see, Crawford, Statutory Construction, § 243; 2 Sutherland, Statutory Construction (3rd ed), §§ 2403-2405.

The decree of the lower court is reversed.

ROSSMAN, J., specially concurring.

The argument that ORS 336.260 is lacking in needed particulars and is, therefore, incapable of administration fails to persuade me. Our school districts, boards and officials are good examples of public administrative agencies that have been invested through the years with extensive administrative powers and that have exercised them to the public's satisfaction. ORS 336.260 became a part of our laws in 1925 (Oregon Laws 1925, Ch 24, p 38). The record contains no intimation that in the 35 years that have passed since the act's enactment any difficulty in administration has developed except the instance now before us. Regulations substantially similar to ORS 336.260 have been adopted by at least one school board without the aid of any legislation whatever. Plainly, the adoption of such a measure is within the powers possessed by school boards. The instance just mentioned is *People ex rel Latimer v. Board of Education,* 394 Ill 228, 68 NE2d 305, 167 ALR 1467. The regulation in that case, which was adopted by the Board of Education of the City of Chicago, was sub-

stantially similar to ORS 336.260 except that it authorized the release of children for one hour per week only and restricted the operation of the measure to the pupils in the 6th and 7th grade classes. The decision mentioned that 22,500 pupils were released weekly under the regulation for religious instruction. Since the purposes of a statute such as ORS 336.260 can be accomplished without any legislation whatever and purely by the exercise of administrative power, the school boards surely can achieve them through the help given by ORS 336.260.

It is easy to find statutes worded even more broadly than ORS 336.260 that entrust administrative powers to school boards and officials but which have presented no difficulties in their daily operation. For example, statutes with rare exceptions do not prescribe or mention the subjects to be taught in our public schools and institutions of higher learning. In fact, they do not even hint at the manner in which the boards and officials should choose the subjects. Yet no difficulty is encountered there, unless one deems precautions to prevent duplications in courses as indicative of difficulty. See 47 Am Jur, Schools, § 200, p 441. Likewise, no legislative enactment names the text books that our schools should employ. Here again the schools have encountered no problem in the handling of this important administrative power. 79 CJS, Schools and School Districts, § 487, p 431, and 47 Am Jur, Schools, § 202, p 443. No statute mentions the hour when our schools should open, but this is merely another detail that has been left to the administrative agencies successfully and that has caused no difficulty.

It is easy to become more specific than the foregoing and show by citation to express provisions of our statutes that ORS 336.260 will present no prob-

lems that our school officials can not readily solve. For example, ORS 336.380 requires that a school board in the district to which it is applicable shall "cause dental inspection to be made at least once in each school year of each pupil." Surely that statute confronts school officials with a task more delicate and perplexing than the release of a child upon the request of its parents for religious instruction. Any one who insists upon preciseness in legislation may look askance at the term "dental inspection," especially since it is to be involuntary; yet the administration of that statute moves along so expeditiously that it provokes no discussion. ORS 336.230 says that:

> "In all public and private schools in Oregon there shall be given regular courses of instruction in the Constitution of the United States. * * *"

No text book is mentioned in that statute and the latter does not specify the length of the course. If the course is compulsory that fact is left unmentioned. ORS 336.240 (1) requires that instruction shall be given in:

> "(a) Honesty, morality, courtesy, obedience to law, respect for the national flag, the Constitution of the United States and the Constitution of the State of Oregon, respect for parents and the home, the dignity and necessity of honest labor and other lessons of a steadying influence which tend to promote and develop an upright and desirable citizenry.
>
> "(b) The effects of alcohol and narcotics upon the human system.
>
> "(c) Kindness and justice to and humane treatment of animals."

Since no trouble has been experienced in the administration of that measure although it contains such loose terms as "courtesy" and "kindness," it seems

that fears are unwarranted that the school officials will be unable to determine the meaning of "instruction in religion."

Oregon is not the only state that has enacted a measure such as ORS 336.260. Measures such as the latter have demonstrated their ability to adapt themselves to successful administration: *Gordon v. Board of Education of City of Los Angeles,* 78 Cal App 2d 464, 178 P2d 488; *People ex rel Latimer v. Board of Education of City of Chicago,* 394 Ill 228, 68 NE2d 305, 167 ALR 1467 (annotated) ; *People v. Graves,* 245 NY 195, 156 NE 663; *Zorach v. Clauson,* 303 NY 161, 100 NE2d 463, affd 72 S Ct 679. See also 79 CJS, Schools and School Districts, § 466 at page 393.

It is unnecessary to go on. The foregoing examples, which could be greatly increased in number, show that the administration of an act such as ORS 336.260 can be entrusted safely to school officials. Surely, if they can be invested with the power of choosing the subjects of instruction, the books that shall be employed and the hour when school shall open—to say nothing of creating a law school—they must have the ability required to administer ORS 336.260. Those who claim that the statute just mentioned should be clarified by imparting to it some details should ask themselves whether the details would not complicate administration rather than solve matters. The success of the measures above mentioned show that the administration of ORS 336.260 can be safely entrusted to the school officials.

The simple truth of the matter is that in the operation of our schools and institutions of higher learning broad administrative powers must be entrusted to the school boards and administrative officials. Such has been the course of legislation for a century or

more. ORS 336.260, in its administrative provisions, merely conforms to a pattern that extensive experience has mapped out for us.

I concur in the opinion written by Mr. Justice O'CONNELL.

SLOAN, J., dissenting.

I disagree with the majority and consider it necessary to state my reasons. In addition to the views expressed by Justice PERRY, with which I concur, I have other reasons.

Number one is that the act fails to say who shall have the responsibility of obeying the command of the parent. To support the selection of a district school board the majority cite examples of the power to select courses of study, textbooks, dental inspection and the power to make rules and regulations generally. What the majority overlook is that the statutes in respect to textbooks and courses of study, for example, specify the *officials responsible* for that task; i.e.: the state board of education. ORS 326.090. Even the statute requiring dental inspection in certain districts *specifies* that the "district school board" shall have the responsibility. The specially concurring opinion, in its reference to ORS 336.240 and its requirements, fails to quote the last subsection of the statute which specifies that the superintendent of public instruction shall perform the requirements of the act. Certainly I do not contend that a statute must spell out to an administrative agency every precise standard or act it shall perform, but I do contend that a statute must specify who or what body is to act and perform the requirements of a statute. This hiatus in the statute will be referred to again later in this opinion

but, first, I want to mention some of the statutory complexity of school district organization.

If we assume, by the silence of the statute, that the district school board was intended to be vested with the burden of performance, what kind of a district school board are we talking about? If every school district were a neat integrated package like Eugene, Salem or Portland, perhaps this would present no problem. But such is not the fact. It will pay to take a brief look at some of the numerous forms of school districts and district school boards now established by statute and the unknown and unspecified power of many of them. In a footnote[1] I have placed a statement from a "Handbook for School Directors in Oregon" published by the state department of education in 1955. The statement quoted merely lists the number and kind of school districts existing in 1953-54. An examination of the statutes

---

[1] "Summaries compiled from reports of the county school superintendents show the following administrative units existing at the end of the 1953-54 school year:

| | |
|---|---:|
| "Elementary School Districts | 562 |
| Unified School Districts | 131 |
| Union High School Districts | 72 |
| County High School Districts | 2 |
| Non-High School Districts | 27 |
| Total | 794 |

"Of these 794 administrative units, which existed in 1953-54, only 131, or 16.5% provided under one board a unified educational program from grades one to twelve.

"In 83.5% of the units the board that provided one level of education had no responsibility for or supervision over the other level of education.

"This was particularly true in the case of the boards of our smallest administrative units, those with fewer than 200 census children. Among these, 378 of 402 which operated schools had no district high school, and 21 were suspended and sending their pupils to other districts, where they had no administrative control of educational policies affecting either their elementary or high school pupils.

"Finally, if we add the 31 Rural School District Boards to the 794 local administrative units reported in the above table, we find that, in 1953-54, we had in Oregon, by this overlapping structure, 825 school boards concerned with educational or financial welfare of the children residing in the basic common school district represented by 693 school boards (the sum of the elementary and unified districts)."

with respect to these different kinds of school districts reveals overlapping, concurrent and undefined areas of authority.

In addition to these districts in existence in 1953-54 the legislature has since added "Administrative school districts". ORS 330.505, et seq. I would not here attempt to decide what the total power and function of such a district may be. Nor can I be informed as to how many, if any, such districts have been formed since the act providing for their creation was passed in 1957.

In 1959 the legislative assembly added to ORS ch 333 a provision for the "Establishment of county unit system". The county unit system is to include both city school districts and county school districts. The act provides for the election of a county school board but apparently fails to specify the respective powers of the county school board and the city school districts and county school districts comprising the county unit system.

As before mentioned, I would not nor could not attempt to analyze the numerous statutes creating and defining respective power of the boards of this complicated structure of districts. However, what has been said should give some indication of the present hodgepodge of school district organizations and the overlapping authority and power of many of them. In some instances the statute provides that the pupils attending a high school in a district other than the district in which the pupil is a resident shall be subject to the rules and regulations of the district operating the school. ORS 335.015 (3) and ORS 335.470. In other instances the statutes appear to be silent.

There are other complications. ORS 332.140 (2) provides that when 100 percent of "persons having

school-age children in an area which is both within a school district and also contiguous to another school district located in another county, the school board of the school district in which such petitioners reside shall allow such petitioners to send their children to school in the school district in the other county if the petitioners show in their petition that they have centered their social and economic activity prior to August 5, 1959, in a nearby area which is located in such other school district or that geographic or climatic factors cause the petitioners to center their social and economic activity in a nearby area. . . ." The school board may not only permit the children of such petitioners to attend the school in the other county, but shall also pay "any applicable costs" incident thereto. The provisions of this particular section are limited to counties "located east of the summit of the Cascade Mountains."

ORS 335.070 provides that any school district "bordering on the state line, not having a high school . . ." may contract with a school district in the adjoining state to send the children of the Oregon district to a high school in the adjoining state. The statute also permits the Oregon district to pay the costs thereof.

In each of the last two situations just mentioned I hesitate to say to which school board the parent would make the application required by ORS 336.260.

The above is only a resume of confusing and perplexing provisions now contained in our statutes with reference to elementary and high school districts in Oregon. To me it is sufficient, however, to show that regardless of the situation prevailing in 1925, when ORS 336.260 was enacted, it is presently impossible for this court to say which of the school boards

functioning within a given area shall bear the heavy burden imposed by the majority opinion. To merely say it is the duty of the district school board is not enough. It should be obvious that in this confusing pattern of divided school district authority somebody has to say what district school board we are talking about.

There is added confusion. The majority rely on ORS 332.330 and 336.030 to establish that district school boards have the power to establish rules and regulations for the government of the schools and pupils. However, 336.030 requires that such rules and regulations must be "consistent with the rules and regulations of the State Board of Education." Subsection (3) of ORS 326.090 gives the state board power to "Prescribe, publish and distribute rules and regulations for the general government of public schools, for the maintenance of discipline therein and for the performance of the board's functions." Other subsections give the state board broad power to regulate nearly all of the activities of local school districts.

This court has already held that a "board of school directors can exercise no other powers than those expressly granted by the statute, and such as may be necessary to carry into effect a granted power: [Citing authority]" *Baxter v. Davis,* (1911) 58 Or 109, 111, 112 P 410, 113 P 438. *School Dist. 106 v. New Amsterdam Cas. Co.,* (1930) 132 Or 673, 681, 288 P 196. Consequently, it would appear, without attempting to decide, that any rule or regulation of a local school district may be superseded by a rule of the state board except in those few instances in which a statute specifically directs a school district to perform a certain act or function. I would not construe ORS 330.260 to be that specific.

Accordingly, it would appear that the state board has the power to establish rules which would govern any school district with respect to the operation of this particular statute. If they have done so it has not been called to our attention. For my own satisfaction I have attempted to examine the various rules and regulations issued by the state board for the governing of the several school districts. The regulations and rules issued by the state board are very voluminous and cover a wide variety of subject matter. I do not purport to say that I have carefully examined all of them. I do find that rule No. XXXIII of "Rules for the General Government of Public Schools and for the Maintenance of Discipline Therein, . . . ." provides that: "Teachers are authorized to require excuses from parents or guardians of pupils, either in person or by written note, in all cases of absence or tardiness or *dismissal* before the close of school. The teacher shall be the judge of the sufficiency of excuses, pursuant to ORS 339.150." (Emphasis supplied). The section mentioned in the rule quoted, ORS 339.150, is that section of the statute which provides for excused absence under the compulsory attendance statutes.

It would seem that the state board, in exercise of the power vested in it, has already said who shall be the "judge of the sufficiency of excuses." I could not attempt to say that the majority opinion revokes the rule above quoted. However, I can say that the extensive power of the state board to regulate the schools of the state creates doubt that even this court has the power to nullify a rule of the state board without a strong showing of arbitrary conduct on the part of the state board.

Based upon these considerations I am of the opinion

that the act is unenforceable by reason of the lack of designation of the precise person or body that is to administer it.

Assuming, however, that the responsibility can be fixed on a district school board, it is then necessary to consider the act itself. ORS 336.260 provides:

> "Attendance at religious instruction. Any child attending the public school, on application of his guardian or either of his parents, may be excused from such school for a period or periods not exceeding 120 minutes in any week to attend weekday schools giving instruction in religion."

Even a casual reading of the statute discloses the vague and ambiguous terms in which it was written and the complete lack of any standards or tests. Taken as a whole it is immediately apparent, for example, that there is no distinction between a school with 1000 students or one with 12 students in eight different grades with one teacher. Nor is there any distinction between a school situate many miles from any kind of a church and those in a metropolitan area with churches close at hand. No provision is made for transportation or supervision. And the statute is very silent about who shall pay any costs incurred in meeting the responsibilities imposed. A few of the other more obvious deficiencies in the statute come to mind.

Notice that the child is to be excused for a "period or periods not exceeding 120 minutes in any week. . . ." Does this mean that, *on the demand of a parent*, the child must be excused for several 15 or 10 or 30 or 40 minute periods each day, or one day a week or on only some of the days of the week? If the act is to be mandatory, as the majority hold, what

restraint may a teacher or principal exercise? May the teacher, with immunity, put a small child on the sidewalk and point the child in the direction of the school? Must the school, or the truant officer maintained by some of the districts, (see ORS 339.040) check on the older students to see if they are going to a religious school or playing hookey? Must the periods be at the same time every day or week or may they be staggered? If a student desiring to be excused is retarded in his school work and needs all the help he can get does the teacher still have to excuse him for the full 120 minutes each week? The majority compel the teacher to do so.

The statute then provides that the child is to be excused to attend "weekday schools". What is a weekday school? Does it mean that only those churches or sects who are either sufficiently opulent or ardent enough to maintain an organized school will qualify? If so, then it would appear that the statute is discriminatory and must be struck down. To constitute a "school" must it have a minimum number of students? Must it have qualified teachers? Is there to be any examination of the doctrines taught by the school to determine if the child is actually receiving spiritual guidance.

We are, then, confronted with what is "giving instruction in religion." Is a parent who does not believe in formal religious training to be permitted to have his child excused for religious training by the parent himself? Or, if a parent is an atheist may his child be excused to be given irreligious training? To deny such a right would probably be a violation of the freedom of religion guaranteed by both the Oregon and the United States Constitutions. *Illinois ex rel McCollum v. Board of Education* (1948) 333 US

203, 68 S Ct 461, 92 L Ed 649, 2 ALR2d 1338. If I desire to have my children gain spiritual experience by communing with nature may I take my children to religious school on the creek bank and fish for two hours each week? This statute provides no test to determine these rights and questions. An example of the difficulty in seeking to apply such an undefined requirement is found in *Joseph Burstyn, Inc. v. Wilson* (1951) 343 US 495, 504, 72 S Ct 777, 96 L Ed 1098, wherein the court said:

> "* * * In seeking to apply the broad and all-inclusive definition of 'sacrilegious' given by the New York courts, the censor is set adrift upon a boundless sea amid a myriad of conflicting currents of religious views, with no charts but those provided by the most vocal and powerful orthodoxies."

It has already been seen that the statute also fails to authorize or specify any identifiable body or person who shall have the power to provide any rules. I have already mentioned that ORS 336.240 directs the superintendent of public instruction to prepare suggestions which will accomplish the purpose of that statute and that he shall "incorporate the same in a course of study for all elementary and secondary schools." It is to be emphasized that no similar authority is granted to anyone by ORS 336.260. The answer given by the majority to these questions is that the statute has been in existence for about 35 years. This, of course, is no answer. And, I daresay, this may be changed when it is announced that this court has ruled that a school is to be compelled to release a child for two hours each week.

In this consideration of the statute, I have referred to the teacher as the person required to make the

decisions. It is assumed that in most instances the teacher will have this ultimate responsibility, particularly in view of the regulation of the state board previously mentioned.

I am aware that serious doubt has been cast upon the rule that a legislative delegation of discretion must contain any standard or test to govern the exercise of the discretion granted. 1 Davis, Administrative Law Treatise (1958), §§ 2.04, 2.11. In the past, however, this court has held that it is necessary that an act contain some standard to govern the administrative authority. *Van Winkle v. Fred Meyer, Inc.* (1935) 151 Or 455, 466, 49 P2d 1140, and more recently in *So. Pacific Co. v. Con. Freightways* (1955) 203 Or 657, 666, 281 P2d 693. Even so, I would not quarrel in such detail with this failure of the statute in question if the person or body responsible to administer this act were specified, and given power to make necessary regulations.

In *Zorach v. Clauson* (1951) 343 US 306, 72 S Ct 679, 96 L Ed 954, the Supreme Court of the United States, by a five to four decision, sustained the constitutionality of a New York released time statute. Although it was not pertinent to the decision in that case, it is observed that the statute involved in that case was a part of the compulsory school attendance law and provided that the commissioner of education of the state of New York was specifically authorized to make necessary rules and regulations to govern the various school authorities. And it appeared that the official had made definite regulations specifying the terms and conditions by which students were to be released. If this were the character of the act in question here I certainly would not have attempted to so explicitly point to some of the administrative

difficulties this act imposes. In fact, the opinion of the majority, by making the act mandatory, places the exercise of discretion not upon any administrative authority but solely upon the will of "either parent."

For the reasons stated I am of the opinion that the statute is so vague and uncertain that it is unenforceable and void. See *State v. Anthony* (1946) 179 Or 282, 169 P2d 587, cert den 330 US 826.

As above stated, I also concur in all of the views expressed by Justice PERRY. The decree of the able circuit judge who decided this case below should be affirmed.

I am authorized to say that WARNER, J., joins in this dissent.

PERRY, J., dissenting.

I concur in Justice SLOAN's dissent, because the act is indefinite as therein set out, and it also appears to me the act becomes more indefinite when it provides that violation of ORS 336.260 is a misdemeanor. ORS 336.990.

Does this mean, as indicated in the majority opinion, that the school board or the board of education, if it fails to enact a compulsory regulation governing excuses based upon such an application, is to be guilty of a criminal act, or does it apply to the teacher who refuses to excuse the child on application of the parent?

If the act could be considered as sufficiently certain in its application, I would still be unable to agree with the majority view that "may" must be interpreted as "shall," because in my opinion such construction, when considered in connection with the misdemeanor provisions of the act, would then make the act unconstitutional, for it seems to me the effect

is that the state invokes its criminal law powers to compel, under the guise of compulsory public school attendance, religious training and, as such, cannot but be violative of constitutional prohibitions.

The constitution of this state provides:

> "The legislative assembly shall provide by law for the establishment of a uniform and general system of common schools." Oregon Constitution, Art VIII, § 3.

It is thus clear that the primary and mandatory duty placed upon the legislature by the people is that it provide for the public education of its citizens, and, therefore, the legislature may not pass any mandatory act that may in anywise interfere with this primary objective.

There can be no question but that the moral fiber inculcated into the youth of this nation through religious education is of very great value in creating responsible citizenship, but the state is prohibited under the first amendment of the constitution from compelling religious instruction.

To interpret the act as "shall" instead of "may" seems to me to be in direct conflict with the powers of the legislature, because the mandatory "shall" places, if necessary, the requirement of honoring the religious excuse above the requirement to provide for a common school education.

There is undoubtedly the right of the parent to exercise parental control over the child, but I would have no doubt of the unconstitutionality of any act which would place in the hands of the parent the power of the state to require that the child be compelled to receive the religious instruction chosen by the parent.

In my opinion, when the law was first enacted, the legislature recognized this problem and made the matter discretionary with the school officials. Senate Bill No. 19 of the 1925 legislature, which was later enacted into law, carried this title:

> "*To authorize excusing* children attending public schools to attend schools giving religious instruction." (Italics supplied.)

No citation of authority is necessary for the proposition that in construing a statute the courts look to the title of the act as an aid in determining the intention of the legislature. The act states the child "may be" excused. The title shows that the legislature as a public policy is authorizing someone to grant a privilege that is thought to be denied under the compulsory attendance act. How can this court then say the act is not permissive, but is mandatory? The act, it seems to me, only grants to the school authorities the right to permit an absence which would be otherwise in violation of the state's compulsory school attendance laws. If the act is so construed no constitutional difficulty is encountered.

The released time act can be considered under the established doctrine of separation of church and state only in the light that the religious education received away from the school premises while the school is required to be in operation and the child in attendance is an aid to the general education of the child. Therefore, the released time should be considered purely as a plan to supplement the child's education, if such is feasible, in conjunction with the general education of the child. The act, so construed, permits the school authorities to grant the request of the parent so long as the request does not interfere with the orderly

operation of the school or the general educational requirements of the child, and if so construed is clearly constitutional, if definite and uniform in application.

I would affirm the decree of the trial court.

I am authorized to say that Justice WARNER and Justice SLOAN concur in this dissent.