Argued and submitted January 15, affirmed March 5, petition for review denied
June 17, 1997 (325 Or 438)

CLACKAMAS COUNTY,
a political subdivision of the State of Oregon,
*Respondent,*

*v.*

Cynthia R. GAY
and Western Parachute Sales, Inc.,
an Oregon corporation,
*Appellants,*

*and*

Jim GIDLEY,
Ernest A. Kunze and Gary Linn,
*Intervenors-Respondents,*

*and*

Thor ARONSON,
*Intervenor.*

(91-11-217; CA A92660)

934 P2d 551

Lawrence R. Derr argued the cause and filed the briefs for appellants.

Michael E. Judd argued the cause and filed the brief for respondent Clackamas County.

Edward J. Sullivan argued the cause for intervenors-respondents Jim Gidley, Ernest A. Kunze and Gary Linn. With him on the brief were Jeffrey T. Lawrence and Preston Gates & Ellis.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

LEESON, J.

Landau, J., concurring.

## LEESON, J.

Plaintiff Clackamas County (county) brought this action to enjoin defendants from operating an airport and conducting a commercial skydiving business in an area of the county zoned for exclusive farm use. Intervenors,[1] who are neighboring landowners, joined in the county's lawsuit. Defendants contended that their activities constituted a lawful nonconforming use. The trial court determined that defendants were correct only as to a narrow strip of land and entered a judgment enjoining defendants from operating their airport and conducting the skydiving business beyond the limited scope of the nonconforming use that the court recognized. Defendants appealed and filed a bond to stay the effect of the judgment. The trial court entered an order staying the judgment in all respects, except a restriction limiting the number of takeoffs and landings and a requirement that defendants log all flights to and from the property. We affirmed the trial court, except for a minor provision that allowed limited airport parking. *Clackamas County v. Gay*, 133 Or App 131, 890 P2d 444, *rev den* 321 Or 137 (1995).

Meanwhile, the legislature enacted ORS 836.625(1), which provides:

> "The limitations on uses made of land in exclusive farm use zones described in ORS 215.213 and 215.283 and limitations imposed by or adopted pursuant to ORS 197.040 do not apply to the provisions of this chapter regarding airport zones."

That statute went into effect on passage. Defendants immediately moved to vacate the judgment, arguing that ORS 836.625(1) effectively repealed all local government regulations of airport uses in exclusive farm use zones. The county and intervenors contended that the statute merely establishes a timetable and process by which local governments must amend their comprehensive plans and land use regulations to create airport zones in the future and has no present effect on the county's existing comprehensive plan and

---

[1] Intervenors Gidley, Kunze and Linn are parties to this appeal. Intervenor Aronson is not.

land use regulations. The trial court agreed with the county and intervenors and denied defendants' motion to vacate. Defendants appeal, and we affirm.

On appeal, the parties repeat the arguments that they made below. The sole issue before us is construction of ORS 836.625(1). Our task is to determine the intent of the legislature by examining the text and context of the statute. We resort to legislative history only if the intent of the legislature is not clear from the text and context. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). We are "not to insert what has been omitted, or to omit what has been inserted." ORS 174.010.

■ Defendants concede that, by its terms, ORS 836.625(1) does not repeal existing local land use regulations. Nonetheless, they contend, we should read such language into the statute, because the legislative history indicates that, in adopting ORS 836.625(1), the legislature intended to repeal existing local land use regulations. According to defendants, Oregon appellate courts will "ignore or add to portions of legislation as necessary if that is the only way to avoid an unreasonable or unintended result." The lead example of that practice, according to defendants, is *Johnson v. Star Machinery Co.*, 270 Or 694, 530 P2d 53 (1974). In that case, the Supreme Court applied "the rule of the equity of the statute" and held that ORS 12.115 (1), the statute of limitations for negligent injury to person or property, also applies to products liability actions. Justice Holman explained:

> "[T]he rule requiring the court to follow the plain meaning of seemingly unambiguous language is not inflexible and not without exceptions. Hence, if the literal import of the words is so at variance with the apparent policy of the legislation as a whole as to bring about an unreasonable result, the literal interpretation must give way and the court must look beyond the words of the act." *Johnson*, 270 Or at 703-04.

*See also State ex rel Kirsch v. Curnutt*, 317 Or 92, 98, 853 P2d 1312 (1993) (citing *Johnson* rule with approval, notwithstanding rule against inserting what has been omitted or omitting what has been inserted).

■ In resolving this case, we need not decide whether the rule of *Johnson* is still viable in the wake of the interpretive template announced in *PGE*, because *Johnson* does not aid defendants. If the rule applies at all, it is where the literal interpretation of the words of a statute is so at variance with the apparent policy of the statute as to bring about an unreasonable result.[2] *Johnson*, 270 Or at 704. As written, ORS 836.625(1) brings about no unreasonable result by leaving existing land use regulations in effect. As intervenors point out, under chapter 836, which provides the relevant context for ORS 836.625(1), "a *process* is put in place, rather than an immediate effect ordered." (Emphasis in original.)

The trial court did not err in denying defendants' motion to vacate the judgment previously entered in this case.

Affirmed.

**LANDAU, J.,** concurring.

I agree with the majority that we are without authority to add to ORS 836.625(1) the language that defendants ask us to insert to avoid an unreasonable or unintended result. I write separately, because defendants' reliance on the "rule of equity" as applied in *Johnson v. Star Machinery Co.*, 270 Or 694, 530 P2d 53 (1974), raises an important issue of statutory construction, namely the extent to which courts are empowered to redraft the language of statutes. In *Johnson*, the Supreme Court did say that courts have the authority to extend the reach of a statute beyond its language, if that is necessary to avoid an unreasonable result. *Id.* at 706. The problem is that both before and after its *Johnson* decision, the Supreme Court also has said precisely the opposite in a number of cases—relying on the statutory command not to insert statutory language that has been omitted. ORS 174.010. This state of affairs cannot help but be confusing to both bench and bar. The two lines of cases

---

[2] Defendants misstate the rule of *Johnson*, claiming that it applies as well when a party has evidence that the language of a statute leads to an "unintended result." It is well established that courts "cannot correct clear and unambiguous language for the legislature so as to better serve what the court feels was, or should have been, the legislature's intent." *Monaco v. U.S. Fidelity & Guar.*, 275 Or 183, 188, 550 P2d 422 (1976).

are irreconcilable, and the conflict should be recognized and resolved.

In my view, we should discard the notion that courts have the authority to rewrite statutes. To begin with, although the court has not expressly overruled *Johnson* or disavowed its prior decisions in which it rewrote the language of various statutes, those cases implicitly have been superseded by the court's most recent template for construing statutes, described in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). Moreover, that is the only position that comports with the statutory command to refrain from adding to a statute language that the legislature did not enact, a statute that was, from all indications, enacted to prevent the very practice that *Johnson* and cases like it exemplify.

The "rule of equity" originated with the 1584 decision in *Heydon's Case*, 76 Eng Rep 637 (Ex 1584), in which the English court called for an examination of, among other things, "the true reason of the remedy" in determining the meaning of an ambiguous statute.[1] The rule, as originally enunciated, had nothing to do with departing from the language of the statute itself. Instead, it was a guide by which the courts could ascertain the intended meaning of enacted language. *See generally* S. E. Thorne, *The Equity of a Statute and Heydon's Case*, 31 Ill L Rev 202, 215 (1936) ("The rules cannot be taken anachronistically as an early effort to inculcate in judges a view that the statute revealed an attitude that the appropriate exercise of judicial power permitted courts to advance. Courts had not yet reached the stage of looking beyond a statute's *words*." (Emphasis in original.)).

---

[1] The court held:

"[F]or the sure and true interpretation of all statutes in general (be they penal or beneficial, restricting or enlarging of the common law) four things are to be discerned and considered:

"1st. What was the common law before the making of the Act.

"2nd. What was the mischief and defect for which the common law did not provide.

"3rd. What remedy the Parliament hath resolved and appointed to cure the disease of the commonwealth.

"And, 4th. The true reason of the remedy[.]"

76 Eng Rep 637, 638 (Ex 1584).

In later years, however, particularly in early 19th-century America, courts invoked *Heydon's Case* and the "rule of equity" as a basis for altering the language of statutes and even for invalidating them altogether. Typically, such courts held that

> "many cases, not expressly named, may be comprehended within the equity of a statute; the letter of which may be enlarged or restrained, according to the true intent of the makers of the law."

*Whitney v. Whitney*, 14 Mass 88, 92-93 (1817); *see also Bridgeport v. Hubbell*, 5 Conn 237, 243-44 (1824) ("a statute ought, sometimes, to have such equitable construction as is contrary to the letter"); *see also generally* William S. Blatt, *The History of Statutory Interpretation: A Study in Form and Substance*, 6 Cardozo L Rev 799, 802-04 (1985) (describing early-American decisions invalidating statutes on equitable grounds).

It was in that context that the Oregon legislature, in 1862, enacted what is now ORS 174.010, which commands courts

> "to ascertain and declare what is, in terms or in substance, contained therein, *not to insert what has been omitted, or to omit what has been inserted*[.]"[2]

---

[2] There is no legislative history of ORS 174.010. It was, however, taken verbatim from the proposed 1850 Code of Civil Procedure for the state of New York, prepared as an expanded version of the 1848 "Field Code," named after its principal author, David Dudley Field. *See generally* Robert N. Peters, *The "First" Oregon Code: Another Look at Deady's Role*, 82 Or Hist Q 383, 394-401 (1981) (describing incorporation of Field Code into 1862 Deady Code and earlier Oregon codes). The extent to which the concerns of Field and other reformers in the East had anything to do with the enactment of the 1862 statute in Oregon generally is debatable. *See generally* Lawrence M. Friedman, *A History of American Law* 406 (2d ed 1985) (suggesting that Western states adopted variations of the Field Code principally because those states were "in a hurry to ingest a legal system. * * * Codes were a handy way to acquire new law."). Nevertheless, it seems clear that, during that period of time there was a rather widespread fear of judicial power in general and concern over the tendency of judges to rewrite or invalidate statutes in particular. *See, e.g.,* Gordon S. Wood, *The Creation of the American Republic 1776-1787*, 297-305 (1969) (noting generally among American colonists the "profound fear of judicial independence and discretion"); Morton J. Horowitz, *The Emergence of an Instrumental Conception of American Law 1780-1820*, in *5 Perspectives in American History* 287, 303 (1971) ("fear of judicial discretion had long been part of colonial political rhetoric"). And it is difficult to imagine that that concern did not precipitate, in significant part, the origination of the command that judges are no longer to "insert what has been omitted, or to omit what has been inserted."

(Emphasis supplied.) In the years following enactment of that statute, however, the courts have been less than uniform in following it.

In its 1891 decision in *State ex rel Everding v. Simon*, 20 Or 365, 26 P 170 (1891), for example, the court refused to extend a statute beyond its terms, commenting:

> "Courts cannot supply omissions in legislation, nor afford relief because they are supposed to exist. * * * 'When a provision is left out of a statute, either by design or mistake of the Legislature, the courts have no power to supply it. To do so would be to legislate and not to construe.' "

*Id.* at 373-74 (quoting *Hobbs v. McLean*, 117 US 567, 579, 6 S Ct 870, 29 L Ed 940 (1886)). Similarly, in *Dilger v. School District 24CJ*, 222 Or 108, 112, 352 P2d 564 (1960), the court held, citing its comments in *Simon*, that "[i]t is axiomatic that the courts cannot in the guise of construction supply an integral part of a statutory scheme omitted by the legislature."

The same court, some dozen years later, reached a contrary conclusion in *Johnson*. In that case, the court held that, although a statute of ultimate repose applied by its terms only to actions "for negligent injury to person or property," it also had to be applied to product liability actions based on theories other than negligence. The court acknowledged that the statute did not say that, but it was convinced that, because the policies that drove the enactment of the statute of ultimate repose as to negligence actions were applicable equally to product liability actions, "it would be unreasonable to apply the statute to negligence cases but not to product liability cases." *Johnson*, 270 Or at 707. The court justified its holding by reference to the "rule of the equity of a statute," from which it claimed authority to extend the reach of a statute to prevent an unreasonable result. *Id.* at 706.

The court took the opposite approach in *Monaco v. U.S. Fidelity & Guar.*, 275 Or 183, 550 P2d 422 (1976). In that case, the court determined whether a statute allowed an insurer to subtract personal injury protection benefits paid to its insured from the amount due under the uninsured motorist coverage whether or not the insured is fully compensated

for the loss. The language of the statute clearly did not limit reduction from the amount payable to situations in which the damages to the insured are less than the uninsured motorist policy amount. The plaintiff nevertheless insisted that the court should read such a condition into the statute, because it would be unreasonable to do otherwise, and because the legislative history evidently revealed that the legislature intended the law to be read in that fashion. The court declined to extend the statute beyond its terms, commenting:

> "Whatever the legislative history of an act may indicate, it is for the legislature to translate its intent into operational language. This court cannot correct clear and unambiguous language for the legislature so as to better serve what the court feels was, or should have been, the legislature's intent."

*Id.* at 188.

Six years later, the court expressed a more expansive view of its authority in *Hewitt v. SAIF*, 294 Or 33, 653 P2d 970 (1982). In that case, the court held that a statute had been drafted unconstitutionally, but then, instead of invalidating the law, the court rewrote it to cure the constitutional infirmity, on the ground that such action most likely comported with what the legislature would have intended. *Id.* at 53. A dissenting opinion complained of the significant separation of powers implications of a court simply redrafting a legislative enactment instead of construing it. *Id.* at 54-55 (Peterson, J., concurring in part, dissenting in part). The majority, however, offered no further explanation.

More recently, the court has continued to cite *Johnson* and to redraft statutes either to effectuate supposed legislative intentions or to avoid unreasonable results. In *Toole v. EBI Companies*, 314 Or 102, 838 P2d 60 (1992), for example, the court extended a workers' compensation lien statute beyond its terms not just to a party but also to his or her attorney:

> "Granted, the statutes, by their terms, do not appear to extend the lien to the cause of action against the attorney. Nevertheless, it is clear that the legislative policy can be vindicated only if the paying agency has a lien in the third-party recovery."

*Id.* at 111. As authority for that conclusion, the court cited to, and quoted from, *Johnson. Id.* at 111-12. Indeed, as recently as 1993, the court has cited with approval the *Johnson* rule. *See State ex rel Kirsch v. Curnutt*, 317 Or 92, 98, 853 P2d 1312 (1993) (quoting rule from *Johnson* that courts may "look beyond the words of an act" to avoid an unreasonable result).

In the very same volume of reported opinions, however, the court described in *PGE* its "template" for all future statutory construction decisions. The first step of that interpretive methodology precludes any such redrafting of legislative enactments. Under *PGE*, courts are first required to ascertain the intended meaning of a statute by reference to its text, in context and in the light of rules of construction that pertain to the examination of the words of a statute and, if necessary, consult legislative history and nontextual rules of construction. *PGE*, 317 Or at 610-12. Among the rules of construction the court cited as relevant at the first stage of analysis is ORS 174.010, which, as I have noted, prohibits courts from adding to a statute language that the legislature did not enact.

In cases decided after *PGE*, the Supreme Court apparently has determined that, under its current interpretive methodology, the command of ORS 174.010 must be taken at face value. For example, in *Local No. 290 v. Dept. of Environ. Quality*, 323 Or 559, 919 P2d 1168 (1996), the court held that the Oregon Administrative Procedures Act, which allows a "person * * * adversely affected or aggrieved" to obtain judicial review of an agency decision, does not countenance representational standing. The reason for its decision, the court explained, was that the statute

"makes no mention of 'representational' standing, and the statutory context does not support such an inference. Indeed, that statute requires that the person bringing the petition [for judicial review] show how *that person* is adversely affected or aggrieved. We are admonished not to add to a statute words that the legislature has omitted. ORS 174.010[.]"

*Id.* at 567 (emphasis in original).

As for rules of interpretation that have been invoked in the past to justify judicial rewriting of a statute, the court's

post-*PGE* cases suggest a very limited vitality. *State v Vasquez-Rubio*, 323 Or 275, 917 P2d 494 (1996), exemplifies the court's current practice. In that case, the court held that a statute making it a crime for a person to "knowingly possess any machine gun * * * not registered as required under federal law" required the state to prove, as an element of the crime, that the machine gun is "not registered as required under federal law." The state argued that such a reading of the statute, although consistent with its literal terms, should not be adopted, because absurd consequences might follow. The court rejected that argument, commenting that such rules of construction do not justify rewriting a statute; instead, they are "best suited for helping the court to determine which of two or more plausible meanings the legislature intended" by the language that it actually enacted. *Id.* at 282. In fact, so far as I can tell, since *PGE*, the Supreme Court has declined every invitation to rewrite the language of a statute. Even in the most difficult of cases, in which the court is faced with the prospect of either extending the reach of the language of a statute or declaring the language meaningless, the court appears uniformly to adopt the latter course. *See, e.g., State v. Webb*, 324 Or 380, 927 P2d 79 (1996); *S-W Floor Cover Shop v. Natl. Council on Comp. Ins.*, 318 Or 614, 872 P2d 1 (1994).

As I think is manifest, the court's decisions are inconsistent. Either the courts have authority to rewrite statutes or they do not. In my view, we should declare that they do not. To be sure, the court's reference to *Johnson* in its 1993 decision in *Curnutt*, is troublesome; the court cited the case as if it were not in the least inconsistent with the interpretive constraint imposed by ORS 174.010. Still, no decision following *PGE* has cited or applied *Johnson*. To the contrary, every one of the court's post-*PGE* decisions emphasizes the limited role of courts in construing statutes and declines to extend the reach of statutes beyond their terms.[3] Moreover, in my

---

[3] The court seems willing to go out of its way to make the point. In *Vasquez-Rubio*, for example, the court held that it was not necessary to address the applicability of the "absurd results" rule, because the consequences about which the state had complained were not, in fact, absurd. 323 Or at 283 n 4. In *dictum*, the court nevertheless went on to explain the rule's limited utility, as a means of selecting from among more than one plausible reading of language actually enacted. *Id.* at 283. The court explained that any other application of the rule would result in

view, the court has been correct in taking that approach. The command of ORS 174.010 is unequivocal: Courts are to ascertain the intended meaning of enacted language, "not to insert what has been omitted, or to omit what has been inserted." Particularly in the light of the historical context in which ORS 174.010 was enacted, I think it is ill-advised for us to ignore or to qualify its terms; it was the very practice of courts rewriting and invalidating statutes on equitable grounds that likely produced its enactment in the first place. As long as we are willing to accept that the legislature constitutionally may constrain our interpretive authority, we cannot gainsay the import of ORS 174.010 merely by appeal to reason, equity or the English common law.

---

unacceptable "rewriting a clear statute based solely on our conjecture that the legislature could not have intended a particular result." *Id.*