Argued and submitted December 23, 1998, reversed and remanded June 2, petition for review denied October 26, 1999 (329 Or 447)

David YOUNG,
*Appellant,*

*v.*

STATE OF OREGON,
*Respondent.*

(97C-10933; CA A100530)

983 P2d 1044

John Hoag argued the cause and filed the briefs for appellant.

Hardy Myers, Attorney General, argued the cause for respondent. With him on the brief were Michael D. Reynolds, Solicitor General, and Mary H. Williams, Assistant Solicitor General.

Before De Muniz, Presiding Judge, and Landau and Haselton, Judges.

DE MUNIZ, P. J.

Landau, J., concurring.

Haselton, J., concurring.

## DE MUNIZ, P. J.

In this declaratory judgment case, plaintiff challenges the trial court's determination that the overtime pay provisions of ORS 279.340(1) (1995)[1] did not apply to state managerial and executive employees.

At all relevant times, the state[2] employed plaintiff in a salaried position. In 1995, the legislature amended ORS 279.340(1) to include the state in the overtime compensation law; before 1995, that statute referred only to nonstate public employers. See ORS 279.340 (1993) ("Labor directly employed by a county, municipality, municipal corporation, school district or subdivision shall be allowed overtime as follows[.]"). After the amendment, ORS 279.340(1) provided:

> "Labor directly employed by a public employer as defined in ORS 243.650[3] shall be compensated, if budgeted funds for such purpose are available, for overtime worked in excess of 40 hours in any one week, at not less than one and one-half times the regular rate of such employment. If budgeted funds are not available for the payment of overtime, such overtime shall be allowed in compensatory time off at not less than time and a half for employment in excess of 40 hours in any one week."

Under the authority of the amended law, plaintiff applied for overtime pay or compensatory time. The state denied plaintiff's request on the ground that, as a professional, salaried employee, plaintiff was exempt from the overtime provisions. At that time, the exemptions from overtime compensation were contained in ORS 279.342, which provided:

> "(5)  Employees exempted from overtime:

---

[1] This case arises from a 1995 amendment to Oregon's overtime compensation law, which operated to include the state in the overtime provisions. ORS 279.340(1) (1995). At that time, salaried state employees were within the law's provisions. ORS 279.342(5)(a) (1995). In the subsequent legislative session, however, the legislature amended the overtime provisions to exempt such workers from the overtime law. ORS 279.342(5)(a) (1997). Plaintiff sought overtime compensation during that two-year window, and, therefore, this case concerns only the overtime law as it stood in 1995. Consequently, all references to the relevant statutes will be to the 1995 versions, unless otherwise noted.

[2] For ease of readability, we refer to the defendant as the state throughout this opinion.

[3] ORS 243.650(20) included the state in its definition of "public employer."

"(a)   By a county, municipality, municipal corporation, school district or subdivision because of the executive, administrative, supervisory or professional nature of their employment[.]"

Because that statute did not expressly exempt state salaried employees from the overtime law, plaintiff filed this action in which he sought a declaratory judgment that he, and other similar state "white collar" employees, were within the overtime pay provisions of ORS 279.340(1). The state moved for summary judgment, urging that the 1995 legislature's inclusion of the state in the overtime pay provisions and the legislature's corresponding failure to exempt state "white collar" workers from those requirements was an inadvertent mistake rather than a definitive expression of legislative intent to include those workers in the overtime law. The trial court granted the state's summary judgment motion. For the reasons that follow, we reverse.

The sole issue in this case is a legal one that requires us to construe ORS 279.340(1) and ORS 279.342(5)(a) to determine whether the "white collar" exemption applies to state workers. In making that determination, we are constrained to apply the methodology established by the Oregon Supreme Court in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993).

■      Under that methodology, we first examine the text and context of a statute because a statute's wording "is the best evidence of the legislature's intent." *Id.* at 610. Related to that principle is a rule of textual construction that governs the scope of our first-level inquiry. That rule limits our role in construing a statute "simply to ascertain[ing] and declar[ing] what is, in terms or in substance, *contained therein, not to insert what has been omitted, or to omit what has been inserted*[.]" ORS 174.010 (emphasis added); *PGE*, 317 Or at 611.

■      The context of a statute relevant at the first level of analysis may include other provisions of the same statute and related statutes, *id.* at 610-11, prior enactments and prior judicial interpretations of those and related statutes, *Owens v. Maass*, 323 Or 430, 435, 918 P2d 808 (1996), and the historical context of the relevant enactments. *Goodyear*

*Tire & Rubber Co. v. Tualatin Tire & Auto*, 322 Or 406, 415, 908 P2d 300 (1995), *on recons* 325 Or 46, 932 P2d 1141 (1997).

■■ If, but only if, the intent of the legislature is not clear from the first level of analysis may legislative history be considered. *PGE*, 317 Or at 611. If that inquiry fails to yield an unambiguous result, then consideration may be given to pertinent maxims of construction. *Id.* at 612.

■■ Here, ORS 279.340(1) provided that "[l]abor directly employed by a public employer as defined in ORS 243.650 shall" receive overtime compensation. Because the qualifying phrase "as defined in ORS 243.650" directly follows the term "public employer" and is not set off by commas, it must, under the last antecedent rule, modify only that term. *State v. Webb*, 324 Or 380, 386-87, 927 P2d 79 (1996). In turn, ORS 243.650(20) defines "public employer" to include the state. Furthermore, because the term "labor" is not modified, is not defined anywhere in the statute or related statutes, and is a word of common usage, we must ascribe to it, its plain, natural and ordinary meaning. *PGE*, 317 Or at 611. In that light, "labor" properly is construed to mean *all* employees of a subject employer. *See Webster's Third New Int'l Dictionary*, 1259 (unabridged ed 1993) (as relevant here, defines labor as "workers employed in an establishment[.]"). Thus, by its plain terms, ORS 279.340(1) entitles all state employees to overtime compensation.

As noted, ORS 279.342 contained the *only* exceptions to that law. Subsection (5)(a) is the "white collar" exception at issue here, and, as the text plainly shows, the state is not among the entities included therein. *See* ORS 279.342(5)(a) (exception applies only to workers employed by "a county, municipality, municipal corporation, school district or subdivision"). Thus, because ORS 279.340(1) unambiguously entitles all state employees to overtime compensation, and because ORS 279.342(5)(a) does not expressly exempt state "white collar" workers from that entitlement, a natural reading of the plain words of those statutes yields a single and unambiguous meaning: State "white collar" workers are entitled to overtime compensation.

The state concedes that point. Nevertheless, the state seeks to obscure that clear meaning with a contextual analysis premised, not on the identification of a contextually based alternative, and clearer, expression of legislative intent, but, rather, on a conclusion that a literal reading of the statutes' plain text, in light of the statutes' context, "would yield an absurd or unreasonable result." From that conclusion, the state argues that, essentially, because the legislature could not have intended an absurd result, "the 'white collar' exemption in ORS 279.342(5)(a) also should apply to state employees[.]" Implicit in the state's argument is the contention that we may use an "absurd result" analysis at the first level of the methodology prescribed by *PGE*.[4]

In support of its argument, the state relies on Supreme Court cases that predate the publication of *PGE* and on *Owens*, which came after *PGE*. With respect to the earlier opinions, the state correctly identifies in those cases a method of statutory construction in which the court relied on the absurd-result maxim to "look beyond the [literal import of] the words of the act." *Johnson v. Star Machinery Co.*, 270 Or 694, 703-04, 530 P2d 53 (1974). *See also McKean-Coffman v. Employment Div.*, 312 Or 543, 549, 824 P2d 410 (1992) ("In construing a statute, courts must refuse to give literal application to language when to do so would produce an absurd or unreasonable result."); *Pacific P. & L. v. Tax Com.*, 249 Or 103, 109-10, 437 P2d 473 (1968); *Holman Trf. Co. v. Portland*, 196 Or 551, 564-65, 249 P2d 175, 250 P2d 929 (1952); *Fox v. Galloway*, 174 Or 339, 347, 148 P2d 922 (1944). However, as we discuss below, *PGE* created a different methodology that is inconsistent with the approach used in those earlier cases.

■   *PGE*, like the cases before it, is based on the principle that the court's role is to discern legislative intent. However, what separates *PGE* from its predecessors is its step-by-step methodology, which proceeds from what the legislature has written, to what the legislature has considered, and finally, as a last resort, to what the court determines makes sense. Significantly, unlike the earlier case law, *PGE* requires ambiguity before the court may leave one analytical level and

---

[4] We express no opinion as to whether, from the text and context alone, the absence of a "white collar" exemption for state employees is necessarily absurd.

proceed to the next. *See PGE*, 317 Or at 611 ("If, but only if, the intent is not clear from the text and context inquiry, the court will then move to the second level[.]"). *See also State v. Chakerian*, 325 Or 370, 376-77, 938 P2d 756 (1997) ("If text and context yield an unambiguous meaning, we proceed no further.").

■■ Additionally, *PGE* demarcated a clear boundary line between the powers of the legislature and those of the court and, in doing so, circumscribed the court's authority to construe a statute. In *State v. Vasquez-Rubio*, 323 Or 275, 282-83, 917 P2d 494 (1996), the court explained the reason for that line as it related to the absurd-result maxim:

> "Because we have already determined that the legislative intent is clear from an inquiry into text and context, we do not apply the statutory maxim that we should avoid a literal application of the statutory text if it will produce an absurd result. *PGE*, 317 Or at 612. That maxim is best suited for helping the court to determine which of two or more plausible meanings the legislature intended. In such a case, the court will refuse to adopt the meaning that would lead to an absurd result that is inconsistent with the apparent policy of the legislation as a whole. *When the legislative intent is clear from an inquiry into text and context, or from resort to legislative history, however, it would be inappropriate to apply the absurd-result maxim. If we were to do so, we would be rewriting a clear statute based solely on our conjecture that the legislature could not have intended a particular result.*" (Emphasis added.)

In other words, *PGE* instructs that the legislative power includes the authority to write a seemingly absurd law, so long as the intent to do that is stated clearly. *PGE*, 317 Or at 610-12. Thus, to the extent that *PGE* established a statutory-construction methodology that is inconsistent with cases that predate *PGE*'s publication date, *PGE* controls. Moreover, because *PGE* relegated the absurd-result maxim to the third level of statutory analysis, under that methodology an ambiguity must be identified at the first and second levels before we may even consider the state's argument. *Id.* at 611-12.

The state also relies on *Owens*, a post-*PGE* case. That case does not aid the state here, however. In *Owens*, the

court followed the *PGE* methodology in construing the provisions of ORS 138.510(2) (1993) and Oregon Laws 1993, chapter 517, section 5, which established time limitations for filing a petition for post-conviction relief. *Owens*, 323 Or at 432. Consistent with *PGE*, the court turned to legislative history only after determining that the relevant statutory phrase was capable of two plausible interpretations. *Id.* at 441. In other words, the court found an ambiguity in the text and context before leaving the first level of analysis. Furthermore, the court premised its first-level analysis on the construction of the phrase "all petitions," which, because of that phrase's general, encompassing connotations, the court found capable of two plausible interpretations. *Id.* at 434-41. *PGE* requires such a finding before ambiguity may be deduced.

■      Here, in contrast, there is no principled way to conclude that ORS 279.340(1) and ORS 279.342(5)(a) may be construed in two ways, let alone two plausible ones. Those statutes contain no ambiguous text. Indeed, the state's argument is based on the absence of text—*i.e.*, the absence of a reference to the state in subsection (5)(a) extending the "white collar" exemption to nonstate governmental entities. As noted, the statutes read in combination may be construed in only one manner: to include state "white collar" workers in the overtime law.

Nevertheless, the state urges that we construe the absence of text in light of contextual evidence of the entire enactment, Oregon Laws 1995, chapter 286, section 26, to achieve an alternative and plausible interpretation. We agree that the entire enactment, as context, is relevant at the first level of analysis. That context does not aid the analysis because it fails to demonstrate explicitly an alternative and plausible legislative intent to exempt state "white collar" workers from the overtime law. Ultimately, and again, the state's reliance on that proof is based simply on the absurdity of the legislature including the state in the overtime law but not exempting state "white collar" workers in the same manner as the legislature exempted other similar, nonstate public workers. We reiterate that *PGE* forbids us from relying on that argument to determine legislative intent where, as here,

there is no ambiguity in the text and context. *PGE*, 317 Or at 611-12; ORS 174.010.

Thus, for the reasons previously discussed, the trial court erred in construing ORS 279.340(1) and ORS 279.342(5)(a) to exempt state "white collar" employees from the overtime provisions.

Reversed and remanded for entry of judgment for plaintiff.

**LANDAU, J.,** concurring.

Judge Haselton suggests that this case is but the latest in a long line of "patently silly" decisions required by adherence to *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), and calls for the adoption of a rule that would permit courts to redraft statutes to effectuate apparent—but unexpressed—legislative intentions. 161 Or App at 42-43 (Haselton, J., concurring).With respect, I think his proposal is ill-advised and that our decision is neither patently silly nor compelled by *PGE*. Our decision recognizes the uncontested fact that, in this case, the legislature made a significant mistake in its enactment of ORS 279.340 and applies the long-acknowledged legal principle that we are unable to redraft the statute to remedy such a mistake.

*PGE* cannot be blamed for everything, certainly not for the inability of courts to redraft legislative enactments. That incapacity is compelled by ORS 174.010, which antedates *PGE* by some 150 years. *See Clackamas County v. Gay*, 146 Or App 706, 711-18, 934 P2d 551, *rev den* 325 Or 438 (1997) (Landau, J., concurring) (tracing history and construction of ORS 174.010).

Our inability to redraft legislation is further compelled by constitutional principles concerning the nature of legislation and the relationship between the judicial and legislative branches. By constitutional definition, legislation consists of language reduced to writing and approved by two houses of the Legislative Assembly and the governor (or, if the governor does not approve, a veto override vote by both houses). Or Const, Art IV, § 25; Art V, § 15b. Legislative intentions that have not been reduced to writing and subjected to the constitutional approval process are not law, and

for the judiciary to give legal effect to such inchoate intentions would amount to an end-run around the constitutional enactment process. *See Fernandez v. Board of Parole*, 137 Or App 247, 252 n 2, 904 P2d 1071 (1995) ("Intentions of the legislature that have not found expression in actual statutory language have not satisfied the constitutional requirements for enactment and simply are not law.").

The courts lack the power to do that in any event. Bedrock principles of the separation of powers long have been recognized to constrain the judiciary from expanding on, or ignoring, statutory language. In 1891, for example, the Supreme Court refused to extend a statute beyond its terms, explaining:

> "Courts cannot supply omissions in legislation, nor afford relief because they are supposed to exist * * *. '[W]hen a provision is left out of a statute, either by design or mistake of the legislature, the courts have no power to supply it. To do so would be to legislate and not to construe.' "

*State ex rel. Everding v. Simon*, 20 Or 365, 373-74, 26 P 170 (1891) (quoting *Hobbs v. McLean*, 117 US 567, 579, 6 S Ct 870, 29 L Ed 940 (1886)); *see also Monaco v. U.S. Fidelity & Guar.*, 275 Or 183, 188, 550 P2d 422 (1976) ("[I]t is for the legislature to translate its intent into operational language. This court cannot correct clear and unambiguous language for the legislature so as to better serve what the court feels was, or should have been, the legislature's intent."); *Dilger v. School District 24CJ*, 222 Or 108, 112, 352 P2d 564 (1960) ("It is axiomatic that the courts cannot in the guise of construction supply an integral part of a statutory scheme omitted by the legislature."). Those principles clearly served as the underpinning for the Supreme Court's most recent decision in point, *State v. Vasquez-Rubio*, 323 Or 275, 917 P2d 494 (1996). In that case, the court declined to redraft a statute to avoid a purportedly absurd result. Echoing concerns expressed earlier in *Everding*, the court held that, when a statute is not reasonably capable of more than one construction, "it would be inappropriate" for a court to redraft it. "If we were to do so," the court explained, "we would be rewriting a clear statute based solely on our conjecture that the legislature could not have intended a particular result." *Id.* at 283.

In that light, it is clear that *Johnson v. Star Machinery Co.*, 270 Or 694, 530 P2d 53 (1974), is simply bad law, not merely because it conflicts with *PGE*, but because it also conflicts with fundamental statutory and constitutional principles concerning the nature of the judicial power. Judge Haselton's impassioned call for a revival of *Johnson* cannot be reconciled with those principles.

The point is worth emphasizing, for, as the number of bills introduced in the legislature grows ever larger, as the nature of legislation becomes ever more complex, and as the relative experience of legislators declines as a consequence of term limits, I expect that we will see more legislative mistakes in the future. It is important for all concerned to understand that the judiciary cannot serve as an extraconstitutional super-legislature that corrects statutory mistakes to effectuate what it speculates the legislature intended.

**HASELTON, J.,** concurring.

*PGE* is authoritative. Accordingly, I concur. But only a fool or a knave would pretend that our result today bears any relationship to the legislature's actual intent.

This case is just the latest, if perhaps the most egregious, of a series of cases in which fidelity to *PGE* has driven our court to patently silly results. Does anyone really believe that the 1995 legislature intended to confer a multi-million dollar windfall on state white-collar employees? Of course not. Does *PGE* permit any other result? No.

With *PGE*, as with any other formula, there must be limits. Legislative draftsmanship is not a science, and neither is statutory construction.[1] When a methodology that purports to effectuate legislative intent inverts that intent,

---

[1] *See, e.g.,* Grant Gilmore, *The Death of Contract*, 4 (1974): "We are not scientists—nor even social scientists—nor were we meant to be. Let us not be overly depressed at that not altogether depressing thought." *See also* Grant Gilmore, *The Ages of American Law*, 109-10 (1977):

"[T]he lesson of the past two hundred years is that we will do well to be on our guard against all-purpose theoretical solutions to our problems. * * * The function of the lawyer is to preserve a skeptical relativism in a society hell-bent for absolutes. When we become too sure of our premises, we necessarily fail in what we are supposed to be doing."

something is seriously wrong. The methodology must be reexamined and modified or discarded.

Venting, though momentarily satisfying, is rarely constructive. My constructive contribution—or, rather, suggestion—is modest, but practical: If we are to live, sensibly, with *PGE*, the "absurd results" principle must be available at the so-called "first level," not the "third level,"[2] of the analysis. That is, there must be an escape hatch for those rare circumstances in which any reasonable person would conclude, notwithstanding unambiguous text, that the legislature could not possibly have intended the result that the text ostensibly yields.

That exception could, I acknowledge, be susceptible to unprincipled manipulation—to result-oriented abuse by "judicial activists," closet legislators in robes, committed to carrying out hidden agendas. But the answer to such unprincipled decision-making does not lie in formulas, which can themselves be easily manipulated. The answer lies in remembering that we are *judges*. It lies in our oaths, in our mutual trust, and in our ultimate accountability to the people of Oregon.

---

[2] *See State v. Vasquez-Rubio*, 323 Or 275, 283, 917 P2d 494 (1996):

"When the legislative intent is clear from an inquiry into text and context, or from resort to legislative history, however, it would be inappropriate to apply the absurd-result maxim. If we were to do so, we would be rewriting a clear statute based solely on our conjecture that the legislature could not have intended a particular result."