Argued and submitted May 16, 2002, on appeal, order concerning calculation of overtime compensation modified to provide that calculations shall be made in accordance with OAR 839-20-030 (1995); order granting summary judgment to defendant on claims for penalty wages based on terminations of employment on or before January 26, 2000, modified to provide that plaintiffs whose employment terminated after June 2, 1999, are entitled to penalty wages; otherwise affirmed; affirmed on cross-appeal September 1, 2004, petition for review allowed February 1, 2005 (338 Or 57)

David YOUNG,
*Appellant,*
*and*
Larry D. Conn, Leonard J. Drung,
Jess Eastman, Debra E. Fery, Bruce L. Fochtman,
Lois G. Harris, Cheryl L. Ho, Lloyd Horsley,
Wilfred Hudson, Mark A. Jones, Robert Jordan,
David C. Judkins, David Kunz, Gordan J. Larson,
Margaret J. Loftis, Judy Murray, Scott R. Proctor,
Richard Reiter, Helen Satterlee, Ernest Schmidt,
Marjorie J. West, James C. Wilson, Randal Windsor,
and Michael D. Woodward,
*Other-Appellants,*
*v.*
STATE OF OREGON,
*Respondent.*
97C-10933; A114099 (Control),

David YOUNG,
Al Chandler, Mike Reinecke,
Karen Eastman (memory),
*Appellants,*
*v.*
STATE OF OREGON,
*Respondent.*
A113141

David YOUNG,
*Appellant - Cross-Respondent,*
*v.*
STATE OF OREGON,
*Respondent - Cross-Appellant.*
A113645
(Cases Consolidated)
96 P3d 1239

John Hoag argued the cause and filed the briefs for appellants. With him on the combined reply and cross-answering brief was David Snyder.

Daniel Casey, Assistant Attorney General, argued the cause for respondent - cross-appellant. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Assistant Solicitor General.

Before Haselton, Presiding Judge, and Deits, Chief Judge,* and Wollheim, Judge.

DEITS, C. J.

---

* Deits, C. J., *vice* Brewer, J.

## DEITS, C. J.

Plaintiff Young and other members of the plaintiff class (plaintiffs) appeal from several orders and judgments in this class action, raising three issues concerning the trial court's decisions. We granted leave to file an interlocutory appeal from the orders, *see* ORS 19.225, and the judgments complied with the requirements of ORCP 67 B that existed when the trial court entered them and when plaintiffs filed their appeals. Defendant cross-appeals from a portion of one order that favored plaintiffs.[1] We modify the trial court's decision on appeal and affirm on cross-appeal.

Plaintiff filed this case as a class action on behalf of himself and all other state employees whom the state considered to be exempt from the payment of overtime compensation or whom it allowed to accrue compensatory time when working more than 40 hours a week. He argued that ORS 279.340(1) (1995),[2] required the payment of overtime to plaintiffs for work occurring between the effective dates of the 1995 amendment extending its coverage to state employees and the 1997 amendment applying the exemption provided in ORS 279.342(5) (1995) to those employees.

---

[1] There are indications in the record that the claims of some plaintiffs may have been fully settled; if so, the appeal is moot as to them. However, we cannot determine from the record whether that is the case. The parties have not notified us of facts that would probably render the appeal moot as to any plaintiff, which ORAP 8.45 requires them to do when such facts exist. We will therefore decide the issues that the parties raise on appeal. The trial court on remand can determine the effect of our decision on the individual plaintiffs. Additionally, we do not understand that the provisions of House Bill 2646 (2003) affect our analysis. *See* Or Laws 2003, ch 576.

[2] This case arises from a 1995 amendment to Oregon's overtime compensation law, which operated to include the state in overtime provisions. ORS 279.340(1) (1995); ORS 279.342(5)(a) (1995). At that time, salaried state employees were within the law's provisions. In the subsequent legislative session, however, the legislature amended the overtime provisions to exempt such workers from the overtime law. Or Laws 1997, ch 793, § 3. Plaintiff sought overtime compensation for work performed during that two-year window, and, therefore, this case primarily concerns the overtime law as it stood in 1995. In 2003, the legislature directed that ORS 279.340 and ORS 279.342 be made part of ORS chapter 653. Or Laws 2003, ch 794, § 186. In the 2003 version of the Oregon Revised Statutes, Legislative Counsel has compiled those statutes at ORS 653.268 and ORS 653.269, respectively. However, the legislature directed that the renumbering of ORS 279.340 and ORS 279.342 becomes operative on March 1, 2005. Or Laws 2003, ch 794, § 337. In this opinion, we refer to the statutes by their numbering in ORS chapter 279, indicating, when pertinent, the year of the relevant ORS compilation parenthetically.

Since the 1995 amendment, ORS 279.340(1) has provided:

> "Labor directly employed by a public employer as defined in ORS 243.650 shall be compensated, if budgeted funds for such purpose are available, for overtime worked in excess of 40 hours in any one week, at not less than one and one-half times the regular rate of such employment. If budgeted funds are not available for the payment of overtime, such overtime shall be allowed in compensatory time off at not less than time and a half for employment in excess of 40 hours in any one week."

Or Laws 1995, ch 286, § 26. Before the 1995 amendment to ORS 279.340, the statute required the payment of overtime compensation only to employees of "a county, municipality, municipal corporation, school district or subdivision." At the same time, ORS 279.342(5)(a) exempted employees of the same entities whose employment was "executive, administrative, supervisory or professional" from the requirements of the statute. Thus, before 1995, the employers who were subject to the statutory requirement to pay overtime were identical to the employers whose executive, administrative, supervisory, or professional ("white collar") employees were exempt from that requirement. However, when the legislature amended ORS 279.340(1) in 1995 to extend the requirement to pay overtime to all public employers, including the state, it did not make a comparable amendment to ORS 279.342(5)(a). As a result, between 1995 and 1997, there was no statutory provision that exempted "white collar" state employees from the right to overtime compensation.

Plaintiff Young is a "white collar" state employee who worked in excess of 40 hours a week during the pertinent time period. He argued to the trial court that the unambiguous language of the statutes entitled him to compensation for that overtime. In response, the state argued that the failure to provide the same exemption for state employees as for local government employees was a legislative drafting mistake that the court should ignore. According to the state, the court should apply its understanding of the legislature's intent rather than the actual meaning of the statute's words. The circuit court accepted that argument and decided the case on the merits in favor of defendant. In *Young v. State of*

*Oregon*, 161 Or App 32, 983 P2d 1044, *rev den*, 329 Or 447 (1999), (*Young I*), we reversed the trial court's decision. We held that the language of the statute was unambiguous and that there was no principled way to construe it to reach any result other than that plaintiff was entitled to compensation for working more than 40 hours a week. *Id*. at 39. We rejected the various theories that the state proposed for ignoring the statutory language and remanded the case for entry of judgment for plaintiff. *Id*. at 39-40.

On remand, the circuit court certified the case as a class action and entered a number of orders as part of processing the claims of the many members of the plaintiff class. Plaintiffs challenge three of those orders on appeal. First, the court held that the proper method for calculating plaintiffs' overtime compensation is the fluctuating hours method that applies in certain circumstances under the federal Fair Labor Standards Act (FLSA), 29 USC §§ 201-219; *see also* 29 CFR § 778.114. Second, it held that those plaintiffs whose employment terminated before defendant paid them their overtime compensation are entitled to penalty wages under ORS 652.150 only if the terminations occurred after January 26, 2000, the date of the issuance of the appellate judgment in *Young I*. Finally, it held that the state is immune from any obligation to pay prejudgment interest on the unpaid overtime and penalties.

Plaintiffs assign error to the first and third orders in their entirety and to the second order to the extent that it denies penalty wages to plaintiffs whose positions terminated on or before January 26, 2000. On cross-appeal, defendant assigns error to the second order to the extent that it awards penalty wages in any circumstance. We modify the order on the method of calculating overtime. Also, as we will explain more fully, we modify the trial court's decision by holding that those plaintiffs whose claims for penalty wages are based on terminations before June 2, 1999, are not entitled to penalty wages but that those plaintiffs whose wage claims are based on terminations after that date are entitled to penalty wages. Finally, we conclude that the state is immune from paying prejudgment interest. In view of our above holding, we affirm on the state's cross-appeal.

Plaintiffs first assign error to the trial court's decision to adopt the method for calculating overtime compensation that the Department of Labor has established under the FLSA when employees work fluctuating hours. We begin by examining the text and context of the applicable statute, ORS 279.340(1), because a statute's wording "is the best evidence of the legislature's intent." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 983 P2d 1044 (1993). Plaintiffs argue that the statute unambiguously requires calculating overtime compensation by dividing the employee's weekly salary by 40 and paying one and one-half times that amount for each hour in excess of 40 that the employee worked in a particular week. They point out that the state agrees that an employee who receives compensatory time when there are insufficient funds to pay overtime will receive one and one-half hours for every hour beyond 40 that the plaintiff worked. Plaintiffs' argument gives one possible meaning of the statutory language considered in isolation, but they fail to recognize that the statute has other possible meanings.

The text of ORS 279.340(1) provides that compensation shall be paid for overtime "at not less than one and one-half times *the regular rate* of such employment." (Emphasis added.) The statute does not define what the "regular rate" is. The foundation of plaintiffs' argument is their assumption that the statute establishes 40 hours as the regular work week for all state employees. If that were the case, plaintiffs would be entitled to one and one-half times their regular rate for every hour per week worked in excess of 40. That assumption, however, is not correct. The terms of the statute do not establish that the regular work week for any salaried employee is 40 or any other number of hours. Nothing in the statute is inconsistent with the employee having a regularly scheduled work week that is either shorter or longer than 40 hours or having a work week that varies from week to week with the demands of the job. In any of those situations, the "regular rate" of the employment will be something other than the weekly salary divided by 40.

We first look to provisions of the FLSA, on which the Oregon statute was modeled, for guidance in interpreting this statute. Similarly to ORS 279.340(1), the FLSA requires

compensation for overtime hours "at a rate not less than one and one-half times the regular rate" of pay. 29 USC § 207(a)(1). The federal courts have consistently interpreted the "regular rate" provision of the FLSA to allow employers to pay a fixed salary for fluctuating hours. *Overnight Motor Transport Co. v. Missel*, 316 US 572, 62 S Ct 1216, 86 L Ed 1682 (1942); *Marshall v. CHALA Enterprise*, 645 F2d 799 (9th Cir 1981). Under the FLSA, the "regular rate" calculated on an hourly basis changes depending on the number of hours that an employee works. Consequently, when an employee is paid his or her salary, the compensation is for *all* of the hours worked. As a result, under the FLSA, the hourly "regular rate" of pay may vary and overtime hours will be compensated at one and one-half the "regular rate." *Overnight Motor Transport Co.*, 316 US at 580. Because the FLSA served as a model for the Oregon statute and used the same language, the federal interpretation of those statutory terms is persuasive here.

We also look to other Oregon statutes to provide context in determining the meaning of ORS 279.340(1). ORS 653.261, which is part of the state minimum wage act, concerns the payment of overtime and uses language that is functionally equivalent to that in ORS 279.340(1). ORS 653.261 authorizes the Bureau of Labor and Industries (BOLI) to require employers to pay overtime to employees who work more than 40 hours in one week; it may not, however, require employers to pay a rate that is greater "than one and one-half times *the regular rate of pay* of such employees[.]" (Emphasis added.) The phrase "regular rate" plays the same role in ORS 653.261 as it does in ORS 279.340(1). The two statutes are, thus, closely related. We presume that the legislature knew of ORS 653.261(1) when it amended ORS 279.340(1) in 1995. The statute therefore provides context for understanding the meaning that the legislature gave this crucial phrase.[3] *See State v. Carr*, 319 Or 408, 411-12, 877 P2d 1192 (1994).

---

[3] Before the 1995 amendment, ORS 279.340(1) (1993) referred to "time and a half pay" for all overtime. The legislature changed the last word of that phrase to the term "regular rate" when it amended the statute. Or Laws 1995, ch 286, § 26.

Before the 1995 amendment to ORS 279.340(1), BOLI had adopted a rule for calculating overtime for nonexempt salaried employees under the state minimum wage act; that rule gave meaning to the statutory phrase in ORS 656.261. OAR 839-20-030 (1995). The rule, thus, establishes the meaning that "regular rate of pay" in ORS 653.261 had at the time that the legislature amended ORS 279.340(1) in 1995 and is an indication of what the legislature intended when it provided for overtime compensation to salaried state employees at "the regular rate for such employment."

OAR 839-20-030 (1995) requires payment of overtime compensation to salaried employees in a number of circumstances that vary by the nature of the agreement between the employer and the employee.[4] The possible circumstances that the rule describes are a regular work week that is normally less than 40 hours, a regular work week that is exactly 40 hours, a regular work week that is greater than 40 hours, and a regular work week that fluctuates from week to week. OAR 839-20-030(c)-(f) (1995). We do not need to describe the rule in detail except to note that, for fluctuating work weeks, the rule determines overtime compensation by dividing the number of hours actually worked each week into the salary for that week in order to determine the regular rate of pay for that week. The employee will receive one-half that rate for each hour worked in excess of 40. Because the regular work week will fluctuate from week to week, the regular hourly rate will also fluctuate and so will the rate of overtime compensation. The rule explains that the overtime compensation is one-half of the regular hourly rate, rather than one and one-half times that rate, because the salary itself constitutes compensation for all of the hours that the employee actually works. Under the rule, thus, the weekly salary includes straight-time compensation for the hours that the employee worked in excess of 40 and the only additional compensation due is one-half of the regular rate for that week. OAR 839-20-030(f) (1995).

---

[4] The rule is generally identical in substance to the rules that apply under the FLSA. The current version of the rule, OAR 839-020-0030, is substantially the same as the 1995 version.

OAR 839-20-030 (1995) provides a reasonable construction of the statutory phrase "regular rate of pay" in the various situations that it describes. Because of the close relationship between the purposes and wording of ORS 653.261 and ORS 279.340(1), the meaning of the term in ORS 653.261, as BOLI has interpreted it, provides guidance in determining the meaning of the phrase "regular rate of such employment" in ORS 279.340(1).[5] Based on the analogous language in the FLSA, as well as the related Oregon statute that has been interpreted to have the same meaning as the FLSA language, we hold that the term "regular rate" of pay in ORS 279.340(1) has the same meaning as in the FLSA.

The trial court reached a similar result by relying on the federal rules, except that it apparently treated all plaintiffs as though their employment agreements provided for fluctuating work weeks. On this record, we cannot say that that is the case. We therefore modify the trial court's order to provide that overtime will be calculated under the formula described in OAR 839-20-030 (1995) that applies to the specific agreement between each plaintiff and the state. Otherwise, we affirm the trial court on this issue.

■ We turn to the question of whether those plaintiffs whose employment has terminated are entitled to penalty wages under ORS 652.150(1),[6] which provides:

> "Except as provided in subsections (2) and (3) of this section, if an employer willfully fails to pay wages or compensation of any employee whose employment ceases, as provided in ORS 652.140 and 652.145, then, as a penalty for such nonpayment, the wages or compensation of such employee shall continue from the due date thereof at the same hourly rate for eight hours per day until paid or until action therefor is commenced. However, in no case shall such wages or compensation continue for more than 30 days from the due date."

---

[5] We would note that the close relationship between those statutes was apparently also recognized by the legislature when, in 2003, it directed that ORS 279.340(1) be moved to ORS chapter 653. Or Laws 2003, ch 794, § 186.

[6] We quote from the current version of ORS 652.150. The pertinent wording has not been changed since 1995. *See* Or Laws 2003, ch 779, § 1; Or Laws 2001, ch 690, § 1.

Some plaintiffs in this case terminated their employment with the state before receiving their overtime compensation and asserted a claim for penalty wages under ORS 652.150(1). The state moved for summary judgment on those claims. In support of that motion, it filed an affidavit of an administrator of the Department of Administrative Services (DAS) in which the administrator stated that the state did not pay overtime to salaried employees who were classified as exempt under state and federal law. He added that the

> "State did not 'know' that those employees might be eligible to receive overtime compensation under state law—specifically, the 1995 amendments to ORS 379.340—until we received the Court of Appeals' decision in this case, and that decision became final after the Supreme Court denied review."

The trial court held that the state's affidavit established that its failure to pay was not willful under ORS 652.150(1). The court explained that the state's affidavit showed that, until this court ruled otherwise, the state had operated under a good faith belief that it did not owe any overtime compensation. The court held that the state did not act willfully in failing to pay overtime compensation to employees who had left state employment before the date of the issuance of the appellate judgment in *Young I*. The trial court granted the state's motion for summary judgment with regard to those employees. With respect to employees that terminated their employment after the issuance of the appellate mandate, the trial court held that the state did act willfully, and, accordingly, those employees were entitled to a penalty. The trial court denied the state's motion for summary judgment with respect to those employees.

The facts in this summary judgment proceeding are not disputed. The issue on review to us is whether the state, as the moving party, was entitled to judgment as a matter of law. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 939 P2d 608 (1997). Accordingly, the critical question before us is whether the state acted "willfully" under ORS 652.150(1) in not paying plaintiffs any overtime pay. For the reasons that we will explain, we modify the trial court's ruling to provide that the state did not act willfully in not paying

the overtime pay of plaintiffs whose employment was terminated before June 2, 1999, the date of this court's decision, but did act willfully with respect to plaintiffs whose employment ended after that date.

The meaning of the term "willfully," as used in ORS 652.150(1), has been the subject of numerous appellate court decisions. As early as 1962, in *Nilsen v. Johnston*, 233 Or 103, 377 P2d 331 (1962), the Supreme Court discussed the meaning of the term. It first noted that the purpose of this statutory provision was to "protect employees from unscrupulous or careless employers who fail to compensate their employees although they are *fully aware of their obligation to do so*." (Emphasis added.) As the court stated, the statute "penalizes only employers who do not pay, even though they know that the compensation is due." The court then explained what is necessary to find that an employer has acted willfully:

> "In *Nordling v. Johnston*, 205 Or 315, 283 P2d 994, 287 P2d 420, 48 A.L.R.2d 1369 (1955), this court said: 'The meaning of the term "wilful" in the statute is correctly stated in *Davis v. Morris*, 37 Cal App 2d 269, 99 P2d 345.' We now quote the definition thus adopted:
>
> > " '* * * In civil cases the word "wilful," as ordinarily used in courts of law, does not necessarily imply anything blamable, or any malice or wrong toward the other party, or perverseness or moral delinquency, but merely that the thing done or omitted to be done was done or omitted intentionally. It amounts to nothing more than this: *That the person knows what he is doing, intends to do what he is doing, and is a free agent.*'
>
> "That definition excludes the individual who does not know that his employee has left his employ or who has made an unintentional miscalculation."

*Nilsen*, 233 Or at 107-08.

The burden to prove willful conduct on the part of the employer, under ORS 652.150(1), is on the plaintiff. *Sabin v. Willamette-Western Corp.*, 276 Or 1083, 1093, 557 P2d 1344 (1946); *State ex rel Nelson v. Lee*, 251 Or 284, 293-94, 444 P2d 548 (1968). Accordingly, the initial question here is whether plaintiffs proved that the state knew that it was obligated to pay overtime to these plaintiffs. The state argues that it did

not "willfully" withhold overtime pay from its departing employees because it had a bona fide good faith belief that it did not owe its salaried employees any overtime. In response, plaintiffs assert that a bona fide good faith belief that would excuse an employer from payment of a penalty under ORS 652.150(1) must be based on a factual dispute, not a legal dispute, such as the proper interpretation of a statute.

The problem, however, with the state's position, as well as plaintiffs' response, is that we have held that, if an employer has actual knowledge that it has an obligation to pay overtime or if such knowledge reasonably can be imputed to the employer, a good faith belief that it has an excuse for not paying overtime will not allow the employer to escape imposition of a penalty under ORS 652.150(1). In *Schulstad v. Hudson Oil Company, Inc.*, 55 Or App 323, 637 P2d 1334 (1981), *rev den*, 292 Or 825 (1982), this court considered the tension between *Nilsen* and *Sabin*, on the one hand, and the Supreme Court's decisions in *Lee* and *Braddock v. Capfer*, 284 Or 237, 239, 506 P2d 340 (1978), on the other. In *Lee* and *Braddock*, the Supreme Court held that a good faith belief by an employer that it did not owe an employee wages could excuse payment of a penalty. As noted above, in *Nilsen*, the court concluded that, despite an apparent good faith belief by the employer that it did not owe the full amount of wages claimed by its employee under the statute, the employer knew that it owed wages to its employee and failed to pay them. The court held that the employer's failure to pay the wages was willful and subjected the employer to a penalty under the statute. In *Sabin*, the Supreme Court held that the defendant willfully withheld wages from the plaintiff employee despite a showing of good faith. In *Schulstad*, we concluded that *Nilsen* and *Sabin* were controlling. We explained that, as found by the trial court, the defendant employer in *Schulstad* knew that it owed its employee wages at the time that the employee left his employment. We held that, although employer believed in good faith that it had an excuse for not paying the wages, its failure to pay them was intentional and the employee was entitled to penalty wages. *Id*. at 329.

In view of the current state of the law, the state's good faith belief that it did not owe overtime wages to its

"white collar" employees does not preclude the conclusion that the state acted willfully in not paying overtime. However, it is apparent from the case law that this is not a strict liability penalty where the act of failing to pay wages due, in and of itself, subjects an employer to a penalty. As this court and the Supreme Court have held, the employer must know it owes the obligation and intend not to comply with the obligation. *Nilsen,* 233 Or App at 107-08; *Vento v. Versatile Logic Systems Corp.*, 167 Or App 272, 3 P3d 176 (2000). In the cases in which this court and the Supreme Court have upheld the imposition of a penalty, the employer was fully aware of its obligation to pay wages, even though it may have thought it had an excuse, *or* the circumstances were such that the employer was charged with knowledge of its obligation.

For example, in *Vento*, the plaintiff employee sought a penalty for the defendant employer's failure to pay her overtime wages within 48 hours of her termination. Plaintiff asserted that employer had "permitted and suffered plaintiff to work in excess of 40 hours per week" and that, consequently, employer owed her overtime. Among other defenses, the employer argued that it did not have enough information to admit or deny whether the plaintiff had worked in excess of 40 hours per week and, therefore, it did not *know* that it owed overtime wages to plaintiff and was not subject to a penalty. In rejecting the employer's argument, we explained that the employer knew that it had an obligation to pay hourly employees overtime wages for overtime work and that its failure to acquire information about how much this employee worked and, consequently, how much it owed its employee did not mean that it had not acted willfully in failing to meet its obligation to pay overtime. We stated:

> "In *Wyatt* [*v. Body Imaging, P.C.*, 163 Or App 526, 531-32, 989 P2d 36 (1999), *rev den*, 330 Or 252 (2000)], we made it clear that a determination of willfulness for purposes of ORS 652.150 is not based on a determination of 'good faith' or 'bad faith.' * * * Rather, the question is whether a 'person knows what he is doing, intends to do what he is doing, and is a free agent.' *Id.* at 531, *quoting Nilsen v. Johnston,* 233 Or 103, 108, 377 P2d 331 (1962); *see also Sabin v. Willamette-Western Corp.*, 276 Or 1083, 1093, 557 P2d 1344

(1976). In *Wyatt*, the employer withheld wages for the purpose of paying insurance premiums with a good faith belief that it could successfully negotiate for the insurance policy in question. 163 Or App at 531. Notwithstanding the employer's apparent good faith, the court nonetheless held that the withholding of the wages was willful for purposes of ORS 652.150. The Oregon Supreme Court similarly has rejected narrow interpretations of the term 'willfully' as used in ORS 652.150. Most recently, the court, in *Taylor v. Werner Enterprises, Inc.*, 329 Or 461, 988 P2d 384 (1999), held that a willful failure to pay wages due occurred when the employer's agent failed to pay the plaintiff on termination the $400 that it earlier had withheld from his wages as a bond. The court noted that 'employers willfully fail to pay their employees when they fail to compensate their employees although they are fully aware of their obligation to do so.' *Id.* at 469, *quoting Nilsen*, 233 Or at 108."

*Vento*, 167 Or App at 277-78.

The Supreme Court's decision in *Taylor* is an example of a case in which an employer did not actually know that it owed wages but the circumstances were such that the court found that the employer should be charged with knowledge that it owed the wages. In *Taylor*, the plaintiff employee sought to recover a penalty for unpaid wages for employer's withholding of a $400 bond following his termination of employment. Employer, Werner, used the services of an agent, DMI, in making employment arrangements and for day-to-day management of its employees. Employer argued that, although its agent knew the employee's bond money had been withheld from his wages, it did not know that and, therefore, penalty wages should not be imposed. The court rejected employer's argument, explaining:

"The question, then, is whether Werner, as the employer, had, or can be imputed to have had, a level of awareness of its obligation to pay plaintiff such that its failure to pay was 'willful.' We hold that it can. The fact that Werner chose to use the services of an agent, DMI, in arranging its employment of plaintiff and other drivers does not relieve or otherwise insulate Werner from its duties and responsibilities under ORS 652.150, nor does it lead to any reasonable inferences that, by assigning those tasks to another entity, Werner somehow absolved itself of

the knowledge that it would be liable for payment of services that it received from plaintiff. In that sense, Werner knew what its agent, DMI, knew. DMI issued a final wage statement in the amount of $0. That fact shows that there was neither a mistake nor a calculation error, but rather an intention not to pay wages when due. DMI's—and, therefore, Werner's—failure to pay or to arrange for proper payment of wages was willful."

*Taylor*, 329 Or at 470.

Consequently, to support a decision that the state's failure in this case to pay overtime was willful, it must be shown that the state knew that it had an obligation to pay wages or that the circumstances are such that the state should be charged with knowledge of its obligation. As noted above, the burden is on the plaintiffs to show that the state knew that it was obligated to pay overtime to its "white collar" employees. The only evidence in the record on this question was an affidavit from an agency administrator that said that the state did not "know" that these employees might be eligible for overtime until the decision by this court in 1999. There is no evidence in the record before this court that demonstrates that the state had any actual knowledge of its obligation before that time.

The next question that we must resolve is whether the circumstances here require that the state be charged with knowledge of its obligation. Plaintiffs argue that because the state legislature adopted the statute that did not include the previous exemption for "white collar" workers from eligibility for overtime pay, we should impute knowledge of this statutory obligation to the state's payroll managers at the time of the statutory change in 1995. Under these particular circumstances, however, we do not believe that that is appropriate. As discussed in *Young I*, the legislature adopted language that did not include the exemption from eligibility for overtime pay for "white collar" employees when it amended ORS 279.340(1) in 1995. However, the state's affidavit indicates that the state was not actually aware of this obligation until this court's decision in 1999. Further, as the trial court noted in its explanation of its decision, it appears that the import of the statutory language was by no means common knowledge:

"Indeed, it appears that the members of the legislative body that passed the statutory changes to the overtime compensation law, ORS 279.340, were also unaware of the unintended effects of the language that they employed. Assuming the Court of Appeals decision to be correct, as we must at this point, that result was certainly not a foregone conclusion, and there is no reason to expect ordinary state employers to be more prescient than their legislative and judicial officials."

Based on the particular circumstances here, we do not believe that the state should be charged with knowledge of a statutory obligation that apparently no one recognized as existing at the time of the adoption of the statute in 1995 and that did not become clear until after the issue was decided by this court. This is not a case where an employer was fully aware of its obligation to pay wages and disregarded that obligation. As we have discussed, this court and the Supreme Court have consistently adhered to the principle that the purpose of the penalty, under ORS 652.150(1), is to "protect employees from unscrupulous or careless employers who fail to compensate their employees although they are fully aware of their obligation to do so." *Nilsen*, 233 Or at 107. This is simply not such a case. We do believe, however, that, as plaintiffs argue, the state should be charged with knowledge of its obligation to pay overtime to its "white collar" employees until after the issuance of this court's decision.[7] After this court's

---

[7] The legislative history of Senate Bill (SB) 143 (1997) reveals that at the time of the amendment to ORS 279.432 in 1997, a representative of the Department of Administrative Services (DAS) testified that the purpose of this bill was to correct a mistake and did not give anyone more rights than they had in 1995. The DAS representative, Patricia O'Sullivan, explained:

"What happened is you drew the state into 340 and you didn't allow the state the same exemptions in 342 that you allowed the locals, and that's caused a bit of a problem. Probably the biggest one is the so-called white collar workers and that is in 5(a) as you can see in 342."

O'Sullivan then explained that white collar workers, such as herself, work until they go home and that that can be quite late. "What's happened in the last two years is that, according to this, we should be getting overtime." She then referred to this case and told the committee that, "[i]f we don't rectify this we will have to deal with the lawsuit and *from then on* we will have to—there'll be big holes in budgets where we'll have to pay everybody overtime." Tape Recording, House Committee on Rules and Elections, SB 143, June 13, 1997, Tape 85, Side B (statement of Patricia O'Sullivan) (emphasis added).

Arguably, that testimony might support the conclusion that the state should be charged with knowledge of its obligation at the time that the statute was amended

decision in *Young I*, there was little doubt that the state had the obligation to pay overtime to its "white collar" employees for overtime work that took place between the adoption of the statute in 1995 and the amendment in 1997.

■     The remaining question, which is the subject of the state's cross-assignment of error, is whether the trial court erred in imposing a penalty against the state for failure to pay overtime wages to "white collar" employees who left the state's employment *after* the issuance of this court's decision, and the Supreme Court denied the petition for review. The state contends that it did not act willfully with respect to those employees because there is a "bona fide" dispute as to how to calculate benefits for those employees and until a final decision is made as to how to pay these benefits, it does know how much to pay them. However, following the issuance of *Young I*, there was little doubt about the state's obligation. At that time, the state was sufficiently aware of its obligation to pay overtime. It knew of its obligation, and it intentionally failed to meet that obligation.

Contrary to the state's argument, the fact that there was a dispute as to how to calculate the obligation did not excuse the state from paying it. The payment could have been made based on plaintiffs' view as to how overtime should be calculated. If that calculation proved to be wrong, the state could have sought to recover the overpayment. Alternatively, the state could have paid the overtime based on its view of how overtime should be calculated. In that case, the state would be assuming the risk that, if the calculations proved to be wrong (which they did not), the state might be subject to a penalty. For the reasons discussed above, we hold that, following the issuance of this court's decision in *Young I*, the

in 1997. However, plaintiffs did not argue before the trial court or this court that, when the statutory amendment was made in 1997, the state's representatives had articulated an awareness of an obligation at the time to pay overtime to white collar employees. Because this argument was not made, no discussion of or information regarding what occurred by the time of the statutory change was presented by any of the parties, and no one asked the trial court or this court to take judicial notice of such information. In any event, it would not be appropriate for this court to take judicial notice of any particular date that the state became aware of its obligation, because that is a factual issue that is not undisputed. OEC 201(b).

state was sufficiently aware of its obligation to justify imposition of the penalty. The trial court's judgment should be so modified.

■ The next issue is whether plaintiffs are entitled to prejudgment interest under ORS 82.010(1)(a) on their unpaid wages and penalties. That statute provides for interest at the rate of nine percent on "[a]ll moneys after they become due." Plaintiffs' overtime compensation became due at the times described in ORS 652.120 and ORS 652.140.[8] The amounts owed were ascertained or readily ascertainable as of those times by simple calculation from plaintiffs' weekly rates of pay and the hours that they worked each week. *See Public Market Co. v. Portland*, 171 Or 522, 625, 130 P2d 624, 138 P2d 916 (1943). The only real dispute between the parties is whether the state is immune from paying that interest.

The state relies on *Seton v. Hoyt*, 34 Or 266, 55 P 967 (1899), in support of its claim of immunity. The issue in *Seton* was whether a legislative change to the legal rate of interest under the predecessor to ORS 82.010(1) applied to county obligations that existed at the time of the change. Under the applicable statute, a county obligation that the county did not have funds to pay at the time of presentment drew interest at the legal rate until the county paid it. In 1898, the legislature reduced the legal rate from eight to six percent, explaining in an emergency clause that its purpose was to reduce a useless burden on the taxpayers. The plaintiff in *Seton* filed a mandamus proceeding to determine whether the reduction applied to existing county obligations. *Id.* at 270-71.

The county argued, among other things, that it was an arm of the state and that a sovereign is not required to pay interest except when self-imposed. The court agreed with that contention, explaining its view in some detail:

"The Supreme Court of the United States has adopted the rule that interest is not allowable on claims against the government, whether they originate in contract or tort, or arise in the ordinary business of administration, or under

---

[8] We have not determined when penalty wages come due. *See Wyatt*, 163 Or App at 535-36.

private acts for relief, passed by congress on special application. But it recognizes the existence of two well-established exceptions—one wherein the government has stipulated to pay interest, and the other where such interest is given by act of congress either expressly as such, or under the name of damages * * *. The rule applies as well to a sovereign state as to the national government. Nor is the state within the purview of a general law regulating the rate of interest upon money due or to become due, and this goes upon the ground that a sovereign is not bound by the words of a statute unless it is expressly named * * *. That the county is but the agent or instrumentality of the state, constituted and employed essentially for the promotion of its general government, and, therefore, subject to like rules and restrictions governing its liabilities as the state, there can be no controversy. * * * We take it, therefore, that a county is not liable for the payment of interest under the general provisions of the statute regulating the rate upon the demands enumerated in said section 3587 as an individual would be where there is no contract to pay interest."

*Seton*, 34 Or at 272-73 (citations omitted). However, that discussion was *dictum* because a statute expressly provided that county obligations would carry interest at the legal rate; the court ultimately held that the legislature did not intend the reduction to apply retroactively. *Id.* at 279-81.

In *Newport Church of the Nazarene v. Hensely*, 335 Or 1, 56 P3d 386 (2002), the Supreme Court adopted the *Seton dictum* as holding. The issue was whether a claimant was entitled to interest on unpaid unemployment compensation benefits. ORS chapter 657, concerning unemployment compensation, does not mention payment of interest to a claimant under the circumstances existing in the case, and there is no explicit legislative authorization for payment of interest on such benefits. The court held that ORS 82.010(1) is a general rule regarding the payment of interest that by itself was inadequate to waive the state's sovereign immunity. It quoted *Seton* to support its view that only a clear legislative expression can waive that immunity and that the state is not included in a general law regulating the rate of interest on money due or to become due. The court distinguished two apparently contrary cases, *North Pac. Const. Co. v. Wallowa County*, 119 Or 565, 249 P 1100 (1926), and

*Public Market Co.*, on the grounds that *North Pac. Const. Co.* did not mention either sovereign immunity or *Seton* and that *Public Market Co.* was an action against a city, which unlike the state or a county was not immune from the general interest statute. The claimant, therefore, was not entitled to interest on the unpaid benefits.

*Newport Church of the Nazarene* controls this case. The only statute that might authorize interest is ORS 82.010(1), the general interest statute, and it is now clear that that statute does not constitute the necessary waiver of sovereign immunity. ORS 30.320 waives the state's sovereign immunity for contract actions, but it does not refer to interest. The Tort Claims Act, ORS 30.260 to 30.295, on which plaintiffs rely because of their assumption that this case is a tort claim,[9] also fails to mention interest in these circumstances. Because there is no express legislative authorization for awarding interest on plaintiffs' claims, whether the claims sound in tort or in contract, the trial court correctly refused to do so.

On appeal, order concerning calculation of overtime compensation modified to provide that calculations shall be made in accordance with OAR 839-20-030 (1995); order granting summary judgment to defendant on claims for penalty wages based on terminations of employment on or before January 26, 2000, modified to provide that plaintiffs whose employment terminated after June 2, 1999, are entitled to penalty wages; otherwise affirmed. Affirmed on cross-appeal.

---

[9] We do not need to address whether that assumption is correct.